John G. GLOVER, et al., Plaintiffs,

v.

Robert H. LIBMAN, et al., Defendants.

Civ. A. No. C79–2009A.

United States District Court,
N.D. Georgia,
Atlanta Division.

Nov. 29, 1983.

David A. Rabin & Joseph R. Manning, Morris & Manning, Atlanta, Ga., for plaintiffs.

Phillip A. Bradley, Long, Aldridge, Heiner, Atlanta, Ga., Keith K. Hillbig, Gen. Counsel, Smith & Hillbig, Torrence, Cal., David R. Harkleroad, Jeffrey M. Smith, Trotter, Bondurant, Griffin, Miller & Hishon, Lawrence S. Burnat, John Christy, Schreeder, Wheeler & Flint, Atlanta, Ga., for defendants.

## ORDER

FORRESTER, District Judge.

This case now comes before the court on a motion to disqualify Joseph R. Manning and the law firm of Morris & Manning as counsel for the plaintiffs in this action by W. Paul Crum, Jr., and Mark W. Leonard, and a motion by the plaintiffs (formerly Delta Coal Program) for assessment of attorney's fees and expenses.

## INTRODUCTION

■ This court has the power and responsibility to regulate the conduct of attorneys who practice before it. *United States v. Kitchin*, 592 F.2d 900, 903 (5th Cir.1979). This is essential to both the quality and appearance of justice. *Kitchin*, 592 F.2d at 904; *In re Yarn Processing Validity Litigation*, 530 F.2d 83, 89 (5th Cir.1976).

In evaluating the issues brought by this motion, this court is guided by the standard of professional conduct of the members of the bar of this court, which includes "the current canons of professional ethics of the American Bar Association." Local Court Rule 71.54. Accordingly, the court is guided by the ABA Code of Professional Responsibility as well as the ABA Model Rules of Professional Conduct, which were adopted by the House of Delegates of the American Bar Association on August 2, 1983.

## STATEMENT OF FACTS AND HISTORY OF PROCEEDINGS.

Delta Coal Program ("Program") was an investment program formed in the fall of 1977, made up of co-owners. It involved mining interests in mining properties; the mineral leases were between the co-owners and Libman. Crum and Leonard were operating managers, investors, and co-owners. They administered the Program to look after the co-owners' interests, and to observe the goings-on of Libman and the other corporations which offered the investment opportunities. Crum and Leonard received operating manager fees and

commissions as remunerations, similar to broker-dealer situations.

In the fall of 1979, Leonard perceived the operations of the Program as "terrible" and "fraudulent." Leonard accordingly wanted to bring suit, as the leases were not productive, and he felt that he and the other co-owners were being defrauded. As a result of his perceptions, Leonard sought John Deal, Esq., as counsel. Leonard, apparently like Crum, wanted to participate in any lawsuit as a plaintiff. It was Leonard's intention to seek to recover the amount of the investments plus damages and to return it to the investors. Transcript (TR) at 15. In October of 1979, a complaint was filed. The plaintiffs were denominated in the complaint as follows: "Delta Coal Program by and through W. Paul Crum, Jr., and Mark W. Leonard, as co-owners, and in their capacity as co-operating managers of the Delta Coal Program." The complaint alleged violations of the federal securities laws, common law fraud, the Georgia Securities Act of 1973, and alleged breaches of fiduciary duties.

On January 11, 1980, a motion to dismiss was filed by defendants Libman, Southeast Energy Corporation, Kentucky Eastern Coal Company, and Ford Energy Corporation. The gravamen of their argument was that the co-owners have a cause of action against Crum and Leonard, and therefore Crum and Leonard cannot be proper representatives of the other co-owners. They contended that inasmuch as Crum and Leonard were offerors, brokers, dealers, and underwriters of the Program within the meaning of the securities acts, Crum and Leonard had an obligation or duty to be sure that no misstatements or omissions of material facts were made during the course of the offering and sale of the working interests. On January 24, 1980, plaintiffs provided a response. They contended the following: (i) The Program is a partnership with capacity to sue; (ii) all of the co-owners are not indispensable parties to this lawsuit; and (iii) Crum and Leonard can adequately represent and protect the interests of the co-owners. On January 30, 1980, Crum and Leonard filed affidavits indicating that they read the plaintiffs' response, swearing that the matters contained therein were true and correct. On March 7, 1980, John Deal filed a Motion to Stay Proceedings for ratification of commencement of action. Deal indicated that a possible conflict of interest existed under DR5–105 of the Code of Professional Responsibility.

Deal's perception of a conflict of interest was based upon two factors. First, Deal represented Crum and Leonard in other matters. Specifically, Deal represented Crum and Leonard in a tax shelter program under the name of Glamis Placer Gold Program, and as general partners in a limited partnership in an apartment project called Villa Capri. Deal's representation as to these matters occurred in 1978. Deposition of John Franklin Deal (Depo.), at 12, lines 3–15; at 14, lines 8–12. In addition, Deal represented Mr. Leonard and his company concerning a license agreement for a computer software program that Leonard was developing in the financial planning industry; this representation occurred in the years 1978, 1979, 1980, and 1981. Depo. at 12, lines 13–15; at 14, lines 8–12. Second, Deal perceived a conflict of interest due to the wedge that was being drawn by the defendants between the co-owners and Crum and Leonard:

I got into the Delta Coal Program through Crum and Leonard as Co-operating managers. They asked me to see what could be done about the fact that the program was not operating. I investigated the facts surrounding the situation and after investigating the facts surrounding the situation, I advised them, as Co-operating managers, that they had a cause of action against Libman, and his several companies, and Levine and Fieldstone and Coopers & Lybrand. I believe I noticed at that point all of the Co-Owners what I saw, including Crum and Leonard. And once again, I looked at myself as representing the Program which was everybody altogether. The suit was filed against the defendant before the Court and when the responsive

pleadings came back from some of the defendants, as I stated before, allegations were made against Crum and Leonard and not made against the other Co-Owners. At that time I began to see a conflict was coming on the horizon, and I could not proceed as counsel on behalf of everyone. I could see that if this action was to go forward, in my opinion as an attorney at law, it was going to have to go forward through one of the Co-Owners coming up with an attorney to represent the program. The reason for that being Crum and Leonard had been pushed off on one side of the tracks by the responsive pleadings and the other Co-Owners on the other side of the tracks.

Depo. at 49, lines 24–25 through 50, lines 1–24. As a result of his perception that a conflict of interest was developing, Deal felt as if he had to withdraw totally from the lawsuit. *See* Depo. at 15, lines 7–14; at 18, lines 15–20; at 22, lines 19–23; at 29, lines 2–5; at 49, lines 24–25 through 50, lines 1–24.

. As a result of the perceived conflict of interest and Deal's withdrawal, Crum and Leonard sought substitute counsel:

We wrote a letter which all the co-owners received, dated February 19th, which you have already as evidence, that stated that there was, that the defendants had come up with this potential conflict of interest and we felt that would be used to continue to delay the case, and that we were going to seek substitute counsel and so on.

TR at 19, lines 15–20.

Mr. Joseph Manning learned about this lawsuit through one of his clients, John Glover:

In February, 1980, my client, John Glover, brought to me a letter he had received from Messrs. Crum and Leonard, dated February 19, 1980. The letter indicated that the defendants in this action were contending that Crum and Leonard could not serve as representatives of the Delta Coal Program in this lawsuit because Crum and Leonard had failed to exercise due care or had participated in the alleged misrepresentations. The letter concluded, "We will be happy to provide further information, including copies of the pleadings, should you or your counsel desire to see them." Mr. Glover discussed this matter with me and requested my advice as to how he should proceed in the matter.

Affidavit of Joseph R. Manning, ¶ 2 (filed December 15, 1981). As a result of the communication by Glover regarding the lawsuit, Manning met with Glover either on the 22nd or 23rd of February. TR at 308, lines 6–17. After reviewing the information available to him, Manning contacted John Deal to discuss the lawsuit with him. Affidavit of Manning, ¶ 2. Evidently, Manning contacted Deal by telephone on February 25 and requested that Deal send to him information about the case and some of the pleadings. TR at 309, lines 4–6. Subsequently, Manning received a letter from Deal, dated February 25, 1980, concerning the Program; appended to the letter was the defendants' motion to dismiss, which Manning had requested in his telephone conversation with Deal, and a letter to all the co-owners. TR at 309, lines 19–22. On March 4, Manning wrote Deal back, indicating that he reviewed the pleadings and offering impressions about the conflict of interest and the ability of Crum and Leonard to continue in a representative capacity. During the month of March, Deal and Manning had numerous communications about Manning's possible representation of the Program.

On April 2, 1980, Manning met with Deal in Richmond, Virginia. At that meeting, the factual background of the case was discussed. In addition, there was discussion concerning the possibility that Crum and Leonard were liable to the co-owners:

I [Manning] told him [Deal] that under the circumstances, they [Crum and Leonard] were in my view the broker-dealers, were acting as the broker-dealers for the transaction, that, that if I had taken the case initially, I would have sued them, and that I felt like that they had some

culpability by virtue of having occupied that position. TR at 314, lines 22–25 through 315, lines 1–2. *See also* TR at 271, lines 18–22. Finally, the meeting also included discussions as to the ways to avoid the suing of Crum and Leonard at the moment:

We [Manning and Deal] discussed the ways of how I could undertake the representation of the program and avoid suing them. And one matter we discussed was some type of agreement where I would agree if they would give me a waiver of the statute of limitations then I would postpone instituting the suit against them if in fact I took the case later.

TR at 315, lines 7–14.

At that April 2 meeting, Manning received documents from Deal, containing information gathered from Deal, Crum, and Leonard. Evidently, Leonard gave Deal authority to meet with Manning, and, if in Deal's discretion documents needed to be disclosed to Manning by Deal, this would be acceptable to Leonard. The documents were contained in a black notebook, and were assimilated by Deal with a view toward Manning's learning about the case. TR at 259, lines 7–12; *id.* at 317, lines 11–21. Mr. Deal gave Manning the black notebook only after Manning had told Deal that Crum and Leonard might have to be sued by the co-owners. TR at 318, lines 12–18. In turning the documents over to Manning, Deal felt that he was not violating any ethical responsibility. Depo. at 27, lines 22–25.

At that point, Manning sought to get the approval from the co-owners of his representation. In a letter sent to the co-owners by Mr. Glover, which was drafted by Manning and his law firm, a majority of the co-owners' consent of Manning's entry into the lawsuit was sought. Affidavit of Manning, ¶ 9. Apparently, the letter made reference to the fact that the defendants had made allegations that had given Crum and Leonard a different interest in the lawsuit than the interest of the other co-owners. *Id.* It was Manning's understanding that while Crum and Leonard had the power to

obtain counsel on behalf of the Program, two-thirds of the co-owners could override Crum and Leonard's power pursuant to subparagraph f of paragraph 1 of the operating agreement. TR at 326, lines 19–25 through 327, lines 1–2. In early May of 1980, Manning received an affirmative response from over two-thirds of the co-owners. Apparently, 31 of the 35 co-owners, exclusive of Crum and Leonard, consented to Manning's entry into the case. TR at 327, lines 11–13; lines 21–23.

On May 15, 1980, a meeting was held in Atlanta, the participants being Deal, Manning, Crum, Leonard, Mr. Harry Winderman (who was there to tell about the involvement of Levine & Fieldstone in the preparation of the offering memorandum, TR at 328–29), and Helen Simmons (paralegal employed by Manning's office, TR at 269, lines 21–25). The meeting was called at the request of Mr. Deal. TR at 329, lines 5–6 (it was Manning's understanding that Winderman, Crum, Leonard, and Deal were in Atlanta on another transaction); *id.* at 257, lines 13–20. According to Mr. Leonard, the purpose of the meeting was to review the case with Manning and to decide whether Crum and Leonard wanted Manning to represent the co-owners. TR at 30, lines 20–22. According to Manning, the purpose of the meeting was to make a final decision as to his entry into the case, and to solidify his representation. TR at 256, lines 16–21; at 257, lines 13–20.

At this May 15 meeting, Manning raised the possibility that the co-owners would have to sue Crum and Leonard. He also indicated that he could not represent them due to a possible conflict of interest between the co-owners and Crum and Leonard; he advised them that as broker-dealers in the transaction that forms the basis of the lawsuit, they might be liable to the other 35 co-owners. Evidently, those remarks by Mr. Manning angered or aggravated Mr. Leonard to the degree that Leonard felt that the meeting was over. TR at 31, line 25 through TR at 32, lines 1–10. Exactly what transpired at that point is in conflict. Mr. Leonard testified at the hear-

ing of the instant motion that he understood Manning as saying that he and Crum are potentially liable in jest or "for the record;" and as a result of his impression of Manning's not being serious, Leonard stayed at the meeting and consented to Manning's participation in the case. *See* TR at 32, lines 13–20; *id.* at 33, lines 5–18. On the other hand, Manning testified that he never conveyed to Leonard that his remarks about their potential liability were to be made just for the record. TR at 332, lines 5–12.

Notwithstanding the conflicting testimony as to whether Manning was serious at that meeting about the possibility that the co-owners would have to sue Crum and Leonard, there was discussion at the meeting as to how to avoid the suing of Crum and Leonard. Based upon his perception that the statute of limitations would expire in late October of 1980, Manning indicated that he would agree not to sue them if they would waive the statute of limitations. *See* TR at 332, lines 15–21. Apparently, Mr. Deal was aware that if Crum and Leonard did not waive the statute of limitations, Manning would institute suit against them on behalf of the co-owners. Depo. at 62, lines 16–20. While it is not clear whether any of the participants at that meeting transferred any documents to Manning, it appears undisputed that subsequent to that meeting, Manning received more documents from Mr. Deal. *See* TR at 259, lines 16–20; at 260, lines 5–9; at 337, lines 10–25 through 338, lines 1–4; Depo. of Deal, at 27, lines 12–17.

As a result of the May 15 meeting, both Crum and Leonard perceived Manning as representing their interests as co-owners. TR at 39, lines 20–25; at 40, lines 16–20; at 41, lines 7–12; at 44, lines 10–21; at 158, lines 22–25; at 163, lines 11–13; at 172, lines 1–3, 8–13. Crum and Leonard were not seeking Manning to represent them as broker-dealers or as individuals aside from being co-owners. TR at 42, 12–14; at 159, 7–12. As Mr. Leonard testified, his intent in getting Manning was to move the case forward so that the co-owners could get their money back. TR at 41, lines 7–12. In addition, Leonard saw Deal as acting in an advisory capacity. TR at 45, lines 13–15. In contrast, Manning perceived the question of Crum and Leonard's representation as "unresolved" at the end of the May 15 meeting. TR at 237, line 9. Manning testified that after the May meeting:

> They were to decide what they were going to do. The option being, they could stay in as named plaintiffs with another lawyer. They could withdraw their claims.

TR at 237, lines 10–14. Apparently, Manning perceived that Mr. Thrasher and his firm (Spearman, Thrasher, Whitley & Costanzo, local counsel for Crum and Leonard) were to continue to represent Crum and Leonard in the case. TR at 248, lines 12–18. *Cf.* Affidavit of John F. Deal, ¶ 4 (filed March 7, 1980, in conjunction with Deal's motion to stay proceedings) (affiant testifies that based on his information and belief, Spearman, Thrasher, Whitley & Costanzo have represented Crum and Leonard in the past and still represent Crum and Leonard on matters presently).

On May 29, 1980, Morris & Manning filed a notice of appearance of counsel. In mid- or late-June, the issue of whether Crum and Leonard wanted to withdraw as plaintiffs arose:

> John [Deal] informed me [Manning] in late June, mid-June, late June, that they wanted to withdraw. The decision had been made to withdraw, and they wanted to execute, he and I had discussed a number of times the waiver of the statute of limitations, so—as an inducement for me not to, not to sue them immediately—that they would execute a waiver of the statute of limitations, and they would withdraw, that would give me some comfort that I could go forward in whatever negotiations I had, would have, didn't have any then, but would have, in settlement or whatever, and before I had to make the hard decision whether to sue the business associates of some of my other co-owners.

TR at 261, lines 7–18. In a letter dated June 25, 1980, from Manning to Crum and Leonard, Manning told Crum and Leonard that he could not represent them as operating managers or their individual interests in this lawsuit. Manning stated explicitly that he reserves the right to sue them on behalf of the Program. On July 7, 1980, Manning filed a motion to dismiss Crum and Leonard as plaintiffs. As an exhibit to his motion, Manning shows that Crum gave him the authority to remove him as a party plaintiff in this action, and that Crum gave him authority to release due diligence notes to Kentucky and Georgia authorities. Crum testified as follows as to why he gave Manning authority to remove him as a party plaintiff in this action:

> Mr. Deal was telling me the defendants were ready to talk about settlement, but they wouldn't go to a settlement table until we were removed as plaintiffs, and that he and Mr. Manning had discussed this and he thought it was a good move for me to remove myself, because he thought that within 90 days, certainly no more than six months we could be settled on this issue. So, in trying to be cooperative to that effort, effort, that's why I signed this.

TR at 388, lines 17–25. In fact, in affidavits of both Crum and Leonard filed with this court, they testified that Manning told them that settlement negotiations would be facilitated if they withdrew from the action. The affidavits of both Crum and Leonard, however, as to this point appear to be incorrect. First, their statements are contradicted by the testimony of Mr. Manning. TR at 353, lines 8–24. Second, on cross-examination of Mr. Crum by Mr. Manning, Crum admitted that conversations of imminent settlement were not between Crum and Manning, and that the averment by Mr. Crum that Manning said to Crum that he had to withdraw because settlement was imminent was not correct. TR at 396, lines 6–14; at 397, lines 6–17.

Throughout the summer of 1980, Manning was under the impression that Crum and Leonard had agreed to execute a waiver of the statute of limitations so that it would not be necessary for him to file an action against them immediately. Manning apparently discussed the matter of the waiver of the statute of limitations numerous times by telephone with Mr. Deal, and during a meeting with Mr. Deal in September of 1980, Manning gave Deal a draft of a waiver and requested that he have Crum and Leonard execute it. Affidavit of Manning (filed December, 1981), ¶ 15. On September 25, 1980, Manning was contacted by Mr. Charles Schreeder, of the law firm of Schreeder, Wheeler & Flint. Mr. Schreeder told Manning that he was representing Crum and Leonard in this matter and objected to the waiver of the statute of limitations that Manning had given to Mr. Deal. TR at 347, lines 23–25 through 348, lines 1–8. On September 26, 1980, Manning was informed by Mr. Schreeder that upon his advice, Crum and Leonard would not execute any waiver of the statute of limitations. TR at 348, lines 18–19.

As a result of Crum and Leonard's refusal to execute the waiver of the statute of limitations, Manning then canvassed the other co-owners to determine whether he could obtain their consent to file a claim against Crum and Leonard. Affidavit of Manning (filed December, 1981), ¶ 16. Consent was obtained from virtually all of the co-owners to file a claim against Crum and Leonard. *Id.*

On October 29, 1980, plaintiff Delta Coal Program through Manning, filed a second amendment to the complaint, which added a claim against Crum and Leonard. The following was alleged. On December 19, 1977, Crum and Leonard entered into an agreement with defendant Universal Heritage by which they were to be broker-dealers, as defined by the federal securities acts. In addition, at all relevant times, Crum and Leonard were "controlled persons" of Universal Heritage, as defined by the federal securities acts, as well as an aider and abetter and co-conspirator with all of the defendants. Finally, it was alleged that the co-owners of the Program had no knowledge of the misrepresentations and omissions of defendants Univer-

sal Heritage, Crum, and Leonard, until the co-owners obtained independent counsel on May 29, 1980. Also on October 29, 1980, this court, through The Honorable Horace T. Ward, granted leave to the plaintiff to file its second amended complaint, and to add Universal Heritage, Crum, and Leonard as additional defendants in this matter.

Approximately one year later, however, in an order filed October 7, 1981, this court, through The Honorable Horace T. Ward, concluded that the order of October 29, 1980, adding Crum and Leonard must be vacated, since "Crum and Leonard were technically still plaintiffs in this case and as no order granting their motion to dismiss had been entered." Order of October 7, 1981, at 8. Judge Ward was apparently referring to Manning's filing of a motion to dismiss Crum and Leonard as plaintiffs on July 7, 1980. Noting that Crum and Leonard should have been given the opportunity to respond to the application to make them defendants, the court ruled that Crum and Leonard are to remain as plaintiffs in this action. The court indicated, however, that "[t]his ruling is without prejudice to the right of the parties to file subsequent motions regarding the status of Crum and Leonard." *Id.* at 9 n. 6. Finally, the court stated the following as to the relationship between the co-owners as comprising the Program, and Crum and Leonard as broker-dealers:

> Although the court has allowed Crum and Leonard to remain as plaintiffs in this action, it is clear that they cannot represent the Program. The parties apparently agree that the Program conceivably has a right of action against Crum and Leonard; it would therefore be manifestly inappropriate to allow Crum and Leonard to represent the Program. Thus, Crum and Leonard may remain as plaintiffs, but may not serve as representatives of the Delta Coal Program. The Delta Coal Program will be allowed to proceed as a plaintiff in its own name at this time. *Further, it is clear that Crum and Leonard cannot be represented by counsel representing the Program. This no longer appears to be an issue as the Program and Crum and Leonard currently have different counsel.*

*Id.* at 9–10 (emphasis added). As a footnote to this paragraph of the order, the court stated: "As the court has ruled that Crum and Leonard may not represent the Program in this action, they would not have the authority to dismiss the attorney selected by a majority of the co-owners, Manning." *Id.* at 10 n. 7.

On November 20, 1981, Crum and Leonard filed their motion to disqualify Manning and the law firm of Morris & Manning as counsel for the Delta Coal Program or any other party to this action.

ARGUMENTS PRESENTED.

Crum and Leonard seek to disqualify the law firm of Morris & Manning from representing the plaintiffs or any other party in this action on several grounds. First, they contend that Manning violated Canon 4 of the American Bar Association Code of Professional Responsibility (CPR), in that Morris & Manning has breached the confidential relationship between an attorney and his client through the following means: (i) By bringing an action against a former client; and (ii) by using documents and confidential communications obtained during the attorney-client relationship against a former client. Second, they contend that Manning violated Canon 9 of the CPR in the following ways: (i) Morris & Manning attempted to represent two clients whose interests were adverse to each other; and (ii) Morris & Manning breached the attorney-client privilege by using confidential information and communications received from a former client in an action against that former client, thereby creating the appearance of professional impropriety. Finally, they contend that Manning violated Canon 5 of the CPR in failing to exercise independent professional judgment on behalf of Crum and Leonard in the following ways: (i) By representing two clients whose interests were adverse to each other; and (ii) by making use of confidential information and communications obtained

in the attorney-client relationship against a former client.

In addition to their seeking the disqualification of the law firm, Crum and Leonard seek a return of all documents received by Morris & Manning during their representation of Crum and Leonard. Additionally, Crum and Leonard seek to disqualify all work product prepared by Morris & Manning in this case.

DISCUSSION.

I. Whether an Attorney-Client Relationship Existed Between Manning and Crum and Leonard, and, if so, the Scope of the Relationship.

"To substantiate a motion for disqualification, the movant must first show that an attorney-client relationship exists or has existed." *American Can Co. v. Citrus Feed Co.*, 436 F.2d 1125, 1129 (5th Cir.1971). *Accord Fred Weber, Inc. v. Shell Oil Co.*, 566 F.2d 602, 607–08 (8th Cir.1977) ("Because Canon 4 is limited by its language to the duty of the lawyer to his client, [citation omitted] one who seeks to employ Canon 4 to disqualify opposing counsel must show counsel to have, or to have had, an attorney-client relationship with an adverse party in the present suit.") (footnote omitted); *In re Yarn Processing Patent Validity Litigation*, 530 F.2d 83, 90 (5th Cir. 1976) ("The prohibition applied to attorneys against representation of conflicting interests rests on the duties of an attorney arising from the attorney-client relationship. In the absence of this relationship, the duties of loyalty and confidentiality do not arise.").

■ In determining whether an attorney-client relationship existed between Crum and Leonard and Manning, the focus must be on the subjective expectations of Crum and Leonard such that their individual belief and reliance are safeguarded. *Westinghouse Electric Corp. v. Kerr-McGee Corp.*, 580 F.2d 1311 (7th Cir.), *cert. denied*, 439 U.S. 955, 99 S.Ct. 353, 58 L.Ed.2d 346 (1978).

As the *Westinghouse* court said:

The professional relationship for purposes of the privilege for attorney-client communications 'hinges upon the client's belief that he is consulting a lawyer in that capacity and his manifested intention to seek professional legal advice.' *Id.* at 1390 (footnote omitted).

■ In the instant case, the court concludes that Crum and Leonard entertained a belief that they were engaged in an attorney-client relationship with Manning regarding their involvement in the Delta Coal Program and their participation as co-owners. Originally, Crum and Leonard wanted to participate as plaintiffs in any lawsuit against the "real defendants," given their status as co-owners. After the perceived conflict of interest arose as to Deal, Crum and Leonard understood the purpose of the May 15 meeting with Manning as to review the case with Manning and to determine whether they wanted him to represent the co-owners. Mr. Leonard testified that he wanted Manning to represent the co-owners, of whom he was one, and that his intent in seeking the Manning law firm was to move the case forward so that the co-owners could get their investment returned.

Q. Well, when you [Leonard] left the May 15 meeting with Mr. Manning, what was your understanding about who your attorney, your attorneys were in the case?

A. Our [Leonard and Crum's] understanding when we left the meeting, and we left the meeting feeling good about that, was Joe Manning was our attorney, representing us as co-owners of the program.

TR at 44, lines 7–12. Even if these facts were to suggest a preliminary consultation by a prospective client with a view toward the retention of a lawyer, a fiduciary relationship would still exist. *See* ABA Code of Professional Responsibility EC4–1 ("Both the fiduciary relationship existing between lawyer and client and the proper functioning of the legal system require the preservation by the lawyer of confidences and secrets of one who has employed or

*sought to employ him.*"); *Cf.* McCormick on Evidence § 88, at 179 (2d Ed.1972) ("Communications in the course of preliminary discussion with a view toward employing the lawyer are privileged though the employment is in the upshot not accepted."). Indeed, the Model Rules of Professional Conduct which were adopted by the House of Delegates of the American Bar Association on August 2, 1983, recognizes that "[a]lmost without exception, clients come to lawyers in order to determine what their rights are and what is, in the maze of laws and regulations, deemed to be legal and correct." Comment to Rule 1.6 of the ABA Model Rules of Professional Conduct.

■ While it can be said that a confidential or fiduciary relationship existed between Manning and Crum and Leonard as to Crum and Leonard's claims against the "real defendants," it cannot be said that a belief by Crum and Leonard that Manning was representing or advising them individually as broker-dealers in a professional capacity existed. *See Levin v. Ripple Twist Mills, Inc.,* 416 F.Supp. 876, 883–84 (E.D.Pa.1976). First, Manning made it perfectly clear to Crum and Leonard that he could not represent them as individuals, inasmuch as their interests were adverse to those of the co-owners.

Second, there are several instances which indicate that Crum and Leonard were aware of their potential liability as broker-dealers prior to their attempt to obtain Manning's representation. Both Crum and Leonard testified that they were aware of their potential liability prior to the initial filing of the lawsuit. *E.g.,* TR at 17–18. Mr. Deal told both Crum and Leonard that they should notify other co-owners regarding possible potential liability and advised them that they needed separate counsel. Both were aware either prior to or at the May 15 meeting of a statute of limitations regarding Manning's not suing Crum and Leonard at that time. *See also* Affidavit of Manning, ¶ 8 (filed December, 1981) (Letter from Deal to Manning which was sent to Crum and Leonard).

Finally, as sophisticated businessmen, they assumed a greater responsibility as a legally informed client. Mr. Crum is employed at the marketing division of Financial Service Corporation, which sells tax shelters. In fact, at the hearing of the instant motion, Crum displayed an appreciation of what constitutes a statute of limitations. TR at 398.

The conclusion that the scope of Manning's representation of Crum and Leonard was limited to their status as co-owners is buttressed by the following testimony of Mr. Leonard:

Q. Well, when you left the May 15 meeting with Mr. Manning, what was your understanding about who your attorney, your attorneys were in the case? A. Our understanding when we left the meeting, and we left the meeting feeling good about that, was Joe Manning was our attorney, representing us as co-owners of the program. We never felt nor did we want him to represent us as, as operating managers, or broker-dealers, *because then we would have the same conflict of interest that John Deal had, if that were the case. Our purpose for the meeting was not to require representation from him as anything other than co-owners of the program, individual co-owners of the program.* So when we left the meeting, we felt that he represented us as co-owners of the program, period.

TR at 44, lines 10–21 (emphasis added).

■ As a result of Manning's representation of Crum and Leonard only in their capacity as co-owners, or of Manning's advancing claims that involve interests circumscribing wrongful conduct of the defendants named in the original complaint, the court concludes that Crum and Leonard never advanced to a point of representation which would allow them to assert that Manning should be disqualified from the entire case. Any breaches of confidences, conflicts of interest, or institutional disruptions that would result from Manning's representation of the plaintiffs in this action would relate solely to the co-owners'

claim against Crum and Leonard. There are no allegations and there is no evidence that Manning crossed party boundaries which caused any actual or potential legal or institutional harm to the defendants named in the original complaint such that Manning's disqualification from the entire case is warranted. In other words, any harm or legal prejudice to Crum and Leonard or any institutional impropriety on Manning's part would go to his representation of the co-owners in a claim against Crum and Leonard.

II. Whether Manning breached the relationship between him and Crum and Leonard, by the co-owners' bringing of a cross-claim against Crum and Leonard.

A. Canon 4 (Model Rules 1.6).

The Code of Professional Responsibility provides that a lawyer shall not knowingly make use of a confidence or secret of his client to the disadvantage of the client. DR4–101(B)(2). The Code provides an exception, however, (1) when the client consents to the disclosure of the confidence or secret *and* (2) "only after" a full disclosure to the client affected. DR4–101(C)(1). In a footnote to this exception, the following is provided:

> [A lawyer] may not divulge confidential communications, information, and secrets imparted to him by the client or acquired during their professional relations, unless he is authorized to do so by the client (*People vs. Gerold*, 265 Ill. 448, 107 N.E. 165, 178; *Murphy vs. Riggs*, 238 Mich. 151, 213 N.W. 110, 112; Opinion of this Committee No. 91).

ABA Opinion 202 (1940).

This principle from the Code has been carried forth in the newly enacted Rules. Indeed, in a Comment to Model Rule 1.6, the following is provided:

> A fundamental principle in the client-lawyer relationship is that the lawyer maintain confidentiality of information relating to the representation. The client is thereby encouraged to communicate fully and frankly with the lawyer

even as to embarrassing or legally damaging subject matter.

In the case at bar, Crum and Leonard argue that Manning is bringing an action against them as a former client in the form of a cross-claim by using the documents received by Manning from Deal and confidential communications obtained during the course of Manning's representation of Crum and Leonard. The court assumes that any period of representation by Manning of Crum and Leonard is from the meeting in Atlanta on May 15 to Crum and Leonard's obtaining of their own counsel in September.

The common-law development of disqualification as to the enforcement of the duty of confidentiality in successive representation was culminated in the landmark opinion of *T.C. Theatre Corp. v. Warner Brothers Pictures*, 113 F.Supp. 265 (S.D.N.Y.1953). The "substantial relationship" test enunciated in this decision is the accepted standard for disqualification:

> [T]he former client need show no more than that the matters embraced within the pending suit wherein his former attorney appears on behalf of his adversary are substantially related to the matters or cause of action wherein the attorney previously represented him, the former client. The Court will assume that during the course of the former representation confidences were disclosed to the attorney bearing on the subject matter of the representation. It will not inquire into the nature and extent.

113 F.Supp. at 268. Here, there is no question that the claim advanced by the co-owners against Crum and Leonard is adverse to the interests of the former clients. Furthermore, since this court presumes that Manning's representation of Crum and Leonard as co-owners entailed a receipt of confidential information regarding their involvement and participation in the Delta Coal Program, *see Amoco Chemical Corp. v. MacArthur*, 568 F.Supp. 42, 46 (N.D.Ga. 1983), there can be no question but that the assertion of a cross-claim against Crum and Leonard is substantially related to

Manning's representation of them as co-owners. In other words, not only is the relationship between Manning's representation of co-owners' interests on the one hand and a claim against two of the represented group as broker-dealers on the other similar in subject matter or factual context, but the relationship entails an overlapping of legal issues. *See Government of India v. Cook Industries,* 569 F.2d 737, 739–40 (2d Cir.1978) (a relationship of "issues" must be shown between the former and current representations).

The facts of this case, however, have an interesting wrinkle: They suggest that Crum and Leonard's conduct fails to display a concern or sensitivity for a misuse of confidential information or a breach of any trust by Manning. At the May 15 meeting Manning disclosed to Crum and Leonard the possibility of a conflict between their interests and the interests of the co-owners. In fact, given Manning's informing of both Deal and Crum. and Leonard of the necessity to execute a waiver of the statute of limitations, Manning disclosed the practical implications which reside in such a conflict. As stated previously, both Crum and Leonard were subjectively aware that they had potential liability as broker-dealers before Manning came on the scene. Given Crum and Leonard's business acumen and sophistication of matters which arise in a program such as that participated in by the co-owners, it would be reasonable to assume that Crum and Leonard would seek protection from any misuse of their confidences, secrets, or documents promptly. It is at the point when the cross-claim was filed against them by Manning and the co-owners, on October 29, 1980, that Crum and Leonard were put on notice as to any perceived actual or potential prejudice that could result from any violations of confidentiality. While Crum and Leonard obtained counsel in September of 1980, and the cross-claim was filed the following month, the motion to disqualify was filed over a year later. Thus, it is reasonable to assume that given their inactivity on the disqualification issue for over a year, they formed a pragmatic realization that any prior disclosures will not prejudice them in a case defending the co-owners' claims that arise from their being broker-dealers in the Delta Coal Program. Accordingly, the court concludes that Crum and Leonard are estopped from raising disqualification specifically on Canon 4 or Rule 1.6 grounds. *See City of Cleveland v. The Cleveland Electric Illuminating Co.,* 440 F.Supp. 193, 203–05 (N.D.Ohio 1977). To the extent that a former client would raise such concerns in the context of a motion to disqualify, the former client would need to contend in good faith that by allowing the lawyer to continue in the present action, the policy of encouraging clients to communicate fully and frankly with the lawyer would be undermined.

■ Given the particular circumstances of this case, the court concludes that Crum and Leonard's not filing the motion to disqualify timely, or with reasonable promptness after they were put on notice as to any harm or prejudice that could result from any misappropriation of their confidences, estops them from raising on Canon 4 or Rule 1.6 grounds a motion to disqualify. If an argument that an attorney's obtaining of a former client's documents is an ill-gotten gain is to be seriously contended by that former client in the context of a disqualification motion, the movant or former client must be prepared to advance it promptly and in good faith. *Cf.* Fed.R. Civ.P. 11. One criterion for such a determination of good faith is the promptness of the former client in advancing the argument, once the client realizes that the documents have the potential to prejudice him.

### B. Canon 5 (Model Rule 1.7).

The Code makes clear that a lawyer must refuse to accept or continue employment if the interests of another client may impair the independent professional judgment of the lawyer. DR5–105(A), (B). If it is both "obvious" to the lawyer that he can represent the interests of each client adequately, and agreeable by "consent" to each client that the lawyer represent each client, however, multiple representation is permitted.

DR5–105(C). Furthermore, the Code explicitly states that each client's consent is to be made "after full disclosure of the possible effect of such representation on the exercise of his [lawyer's] independent professional judgment on behalf of each." *Id.*

The presupposed principle in the Code that loyalty is an essential element in the lawyer's relationship to a client is carried forth in Model Rule 1.7, which provides as follows:

(a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:

(1) The lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and

(2) Each client consents after consultation.

(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

(1) The lawyer reasonably believes the representation will not be adversely affected; and

(2) The client consents after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

■ While it is well settled that the rule requiring an attorney's disqualification upon his representing conflicting interests is applicable even though an attorney acted in good faith, Annot., *Representations of Conflicting Interests as Disqualifying Attorney from Acting in a Civil Case,* 31 A.L.R.3d 715, 722–23 (1970), the facts have presented a slightly different issue: Whether representation of both the co-owners and Crum and Leonard entail "differing interests" or "direct adversity." *See* ABA Code of Professional Responsibility EC5–14. Crum and Leonard would want this

court to view Manning's representation (i) as simultaneously advancing the interests of the co-owners while asserting that two of these co-owners—his clients—are liable to the remainder of his clients, and (ii) as inherently conflicting and therefore unethical. Manning, however, is not representing the two co-owners in the capacity as broker-dealers or as recipients of potential liability from the other co-owners. While an impermissible conflict may exist by incompatibility in positions in relation to an opposing party, Comment to Model Rule 1.7; *see* 7A C.J.S. *Attorney & Client* § 150, at 209 (1980), the instant case is factually dissimilar to one where an attorney represents both an insurer and an insured, or one where an attorney represents multiple defendants in a criminal case. Here, the scope of Manning's representation of Crum and Leonard was identical to, and not conflicting or inconsistent with, the co-owners. Any inherent conflict does not reside in unethical representation, then, but is due to the status of Crum and Leonard—as both co-owners and broker-dealers—and its application to liability under the securities law. *See, e.g.,* 15 U.S.C. § 77*l*(2) (civil liability against offeror of a security for misleading purchaser by means of a prospectus or other communication); *Globus v. Law Research Service, Inc.,* 287 F.Supp. 188 (S.D.N.Y.1968) *aff'd,* 418 F.2d 1276 (2d Cir.1969), *cert. denied,* 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93 (1970) (as goal of securities laws is to provide prospective investors access to the truth, both issuer and underwriter must investigate facts set forth in a prospectus or offering circular).

Crum and Leonard rely heavily on the Second Circuit case of *Fund of Funds, Ltd. v. Arthur Andersen & Co.,* 567 F.2d 225 (2d Cir.1977), and contend that that case is directly in point to the case at bar. The court disagrees. In *Fund of Funds,* Morgan Lewis & Bockius, a law firm, was regional counsel for Arthur Andersen & Co., an international accounting firm. In 1973, Morgan Lewis accepted a retainer from Fund of Funds with the knowledge that Arthur Andersen might be implicated

in securities actions brought on behalf of the fund. Robert Meister, a partner in the law firm of Milgrim Thomajin & Jacobs, effectively served as Morgan Lewis' understudy. As Morgan Lewis' ethical dilemma developed to the extent that it was incapable of pursuing a claim against Arthur Andersen, Meister emerged and effectively became the extension of Morgan Lewis' involvement. Arguing that Meister and his law firm were in a position to receive relevant confidences from Morgan Lewis regarding Arthur Andersen and that Meister and his firm aided and abetted Morgan Lewis' breach of fiduciary duty thereby violating Canons 4, 5, and 9, Arthur Andersen moved to disqualify Meister and his law firm. The Second Circuit reversed the district court's refusal to disqualify Meister and his law firm, and held that "a delicate balance between the Fund's interest in representation by counsel of its choice and the need to maintain high ethical standards within the profession of law" warrants the disqualification. *Id.* at 236. The court found especially compelling the following facts:

> Meister accepted the retainer ... to sue Andersen knowing of the Morgan firm's ethical dilemma. Indeed, his retention as counsel was premised on and resulted from the Morgan firm's incapacity to pursue the claim itself. Armed with that knowledge, and aided in some degree by Morgan Lewis, Meister should not have accepted the retainer.

*Id.* at 234. While the movants would want this court to read Crum and Leonard as standing on similar footing to Arthur Andersen, Deal as standing on similar footing to Morgan Lewis, the Fund as standing on similar footing to the co-owners, and Meister as standing on similar footing to Manning; a sensitive reading of the facts of this case requires otherwise. In contrast to Arthur Andersen in *Fund of Funds*, Crum and Leonard were directly involved in requesting Deal to represent them as well as the co-owners. Furthermore, with knowledge of their potential liability to the co-owners, Crum and Leonard were directly involved in a determination of whom would replace Deal as the attorney who would go after the "real defendants." Furthermore, in contrast to Meister in *Fund of Funds*, Manning did not serve in a capacity as an understudy to Deal. Given the involvement of Crum and Leonard in the selection of Deal's successor, it cannot be said that Manning is a mere extension of Deal, merely stepping in Deal's shoes. Crum and Leonard effectively served as overseers to advance their own interests as against either the co-owners or defendants; as such, they were in a position to thwart any practical harm to them that could have resulted from Deal's voluntary selection of an attorney to represent the co-owners' interests solely. Hence, Crum and Leonard do not stand like Arthur Andersen as an innocent victim of a conflict of interest. *Compare Fund of Funds, Ltd., supra, with Black v. Missouri*, 492 F.Supp. 848 (W.D.Mo.1980).

■ Despite the conclusion that Manning's representation of both Crum and Leonard and the co-owners simultaneously did not entail differing or adverse interests, Manning's being in a posture to represent in any capacity both the broker-dealers as well as co-owners of a financial program raises a conflict of interest harm: There is a potential of substantially different settlement possibilities of the claims in question. *See* Comment to Model Rule 1.7. Furthermore, there is evidence to suggest that Manning experienced a subjective split of loyalties which could have ultimately resulted in a statute of limitations bar to any claim against Crum and Leonard by the co-owners:

> The other co-owners had a little bit stronger feeling towards them [Crum and Leonard] than it turned out to be, and so I knew they had other business arrangements, and my whole, my whole feeling about whether we should sue them or not was torn between the obligation that you normally sue everybody you can, and the obligation to the people that, hey, these guys have business relationships together, and I don't want to disrupt those.

TR at 237, lines 20–25 through 238, lines 1–2. In other words, Manning's juggling act in attempting to avoid suing Crum and Leonard displayed a split of loyalties. While Manning as a matter of fact did finally file the cross-claim on behalf of the co-owners, the court believes that it is not dispositive, and is of no consequence *insofar as institutional concerns are relevant*. A mere *potential* of inadequate representation that is caused by a split of loyalties is a harm that the conflict of interest rules were designed to protect. *See, e.g., Cinema Five, Ltd. v. Cinerama, Inc.*, 528 F.2d 1384, 1386 (2d Cir.1976) (Canon 5 provides that an attorney's professional judgment must be exercised "free of compromising influences" and "solely for the benefit of the client."); *Pennwalt Corp. v. Plough, Inc.*, 85 F.R.D. 264, 271 (D.Del. 1980) (the "underlying purpose of Canon 5 is to insure the absolute and unfettered loyalty of an attorney to a particular client.").

■ Accordingly, the court finds that the facts reveal a harm that the conflict of interest provisions sought to protect: Manning put himself in the position to serve two masters in the same matter. The court wishes to underscore, however, that this does not mean that Manning acted in bad faith or with a willful disregard of the legal process or the integrity of the attorney-client relationship. Indeed, after noting his feeling of being torn in whether or at what point to sue Crum and Leonard, Manning testified: "But I was put in a corner where I had to do something, and I felt I had a legal obligation to make certain recommendations, which we did." TR at 238, lines 2–4.

This finding of a conflict of interest harm is but one factor that the court must weigh in determining whether the relief sought by Crum and Leonard is warranted.

C. Canon 9.

Canon 9 of the Code provides, "A lawyer should avoid even the appearance of professional impropriety." This attention to the appearance of wrongful conduct is directed to the interests of maintaining public confidence in the legal profession and system. *See* ABA Code of Professional Responsibility, EC9–1, –2.

The leading case on this principle in this circuit is *Woods v. Covington County Bank*, 537 F.2d 804 (5th Cir.1976). The court opined as to the nature and scope of Canon 9 as follows:

It does not follow, however, that an attorney's conduct must be governed by standards which can be imputed only to the most cynical members of the public. Inasmuch as attorneys now commonly use disqualification motions for purely strategic purposes, such an extreme approach would often unfairly deny a litigant the counsel of his choosing. Indeed, the more frequently a litigant is delayed or otherwise disadvantaged by the unnecessary disqualification of his lawyer under the appearance of impropriety doctrine, the greater likelihood of public suspicion of both the bar and the judiciary. An overly broad application of Canon 9, then, would ultimately be self-defeating. Therefore, what has been said with respect to judicial conduct is equally applicable here. A lawyer need not "yield to every imagined charge of conflict of interest, regardless of the merits, so long as there is a member of the public who believes it .... Surely there can be some objective content to any inquiry into whether the 'appearance of justice [or propriety]' has been compromised in a given case." J. MacKenzie, *The Appearance of Justice*, 240 (1974). Consequently, while Canon 9 does imply that there need be no proof of actual wrongdoing, we conclude that there must be at least a reasonable possibility that some specifically identifiable impropriety did in fact occur.

*Id.* at 813 (footnotes omitted). The court's pragmatic approach is further underscored in a footnote which adopts the viewpoint that appearance of impropriety is but one factor in a weighing or balancing process in evaluating disqualification: "We emphasize that an attorney need not be disqualified even where there is a reasonable possi-

bility of improper professional conduct.... [A] court must also find that the likelihood of public suspicion or obloquy outweighs the social interests which will be served by a lawyer's continued participation in a particular case. Under Canon 9, an attorney should be disqualified only when both of these standards have been satisfied." *Id.* at 813 n. 12.

Interestingly, the Model Rules fail to have a counterpart to this principle. Perhaps the ABA determined that the "appearance of impropriety" standard was unworkable or too vague to serve as a guide for attorneys or as a policy consideration for judicial decisions. Within the context of vicarious disqualification, a Comment provides that:

This rubric [appearance of impropriety] has a two-fold problem. First, the appearance of impropriety can be taken to include any new client-lawyer relationship that might make a former client feel anxious. If that meaning were adopted, disqualification would become little more than a question of subjective judgment by the former client. Second, since "impropriety" is undefined, the term "appearance of impropriety" is question-begging.

Comment to Model Rule 1.10.

While the fashioning of any remedy or sanction is discussed in the following section, the court determines, however, that at this point for the limited purpose of determining the costs and benefits of disqualification, it is appropriate to articulate any events, transactions, or occurrences which arguably may impinge upon an interest relating to the public confidence in the judicial system.

In this case, Leonard testified that he would not have turned over to either Deal or Manning any documents if he knew that Manning would use that information against him in the form of a claim against him and Crum. TR at 32, lines 21–25. He further testified that he felt good about Manning representing the co-owners' interests, TR at 49, lines 4–19, and that he acted on his perception that Manning was not

sincere in stating that he would have to sue him and Crum by not walking out at the May 15 meeting. TR at 31, lines 19–25 through 32, lines 1–20.

Crum testified that he perceived Manning as his friend, TR at 163, lines 8–13, and that if he thought Manning would file suit against him and Leonard, he would not have supported Manning's becoming counsel for the co-owners. TR at 172, lines 14–23.

 Therefore, in the context of Canon 9, the court finds that Manning's filing of a claim against two persons who were at one time his clients in some capacity and who subjectively perceived that he would not sue them and acted on that belief creates an appearance of professional impropriety.

D. Summary.

In examining the issue of whether Manning breached a professional relationship with Crum and Leonard by bringing a cross-claim against them, the court has now examined the facts in the context of the principles of confidentiality, conflict of interest, and the appearance of impropriety. Two findings of "harm" have been made. First, this court has found a harm that the conflict of interest provisions sought to protect: Manning put himself in the position to serve two masters in the same matter, by creating a potential for inadequate representation resulting from a split of loyalties. This finding results from Manning's conduct in representing both Crum and Leonard and the persons comprising the Program in their capacity as co-owners. Second, this court has found a harm that the appearance of impropriety provisions sought to protect: Manning's filing of a cross-claim against Crum and Leonard—two persons who were his clients in some capacity and who perceived that he would not sue them and acted on that belief—creates the appearance of impropriety.

The first "harm" relates uniquely to the co-owners, rather than Crum and Leonard, inasmuch as any split of loyalties was dis-

advantageous to them. In other words, in the factual context of Manning's serving two masters in a single matter, Crum and Leonard were the favored clients. Any bar of the co-owners' claim against them by the statute of limitations would work to their benefit. As Manning is now the apparent choice of counsel for the co-owners or Program, the court can only conclude that the "harm" articulated is of institutional value, and therefore plays no part in determining whether Crum and Leonard have been prejudiced. Likewise, the second "harm," as serving an interest explicitly directed to public perception, is of institutional value.

Therefore, at this juncture of the analysis, the court concludes that these facts particularly circumscribe institutional concerns.

III. Whether Disqualification of Manning from Asserting a Cross-Claim on Behalf of the Co-Owners against Crum and Leonard is Warranted Based upon this Court's Findings that Institutional Concerns Have Been Implicated.

At the outset, this court reiterates its prior conclusion in Section I that insofar as the remedy of disqualification is concerned, any harm or legal prejudice to Crum and Leonard or any institutional impropriety by Manning would relate solely to his representation of the co-owners in a claim against Crum and Leonard. To the extent that broader institutional concerns are involved—a public perception that Manning may have acted improperly or put himself in a position to be disloyal—the court believes that sanctions other than disqualification, such as a fine or professional discipline, would not be appropriate. *Cf. Jackson v. Washington Monthly Co.*, 569 F.2d 119, 123 n. 24 (D.C.Cir.1977) (under the court's disciplinary authority, court may reprimand lawyer, hold lawyer in contempt, or prohibit lawyer from practicing before court for a limited time); *Esser v. A.H. Robins Co.*, 537 F.Supp. 197, 200 (D.Minn. 1982) (under court's authority to regulate bar, court has wide discretion in framing sanctions other than disqualifying counsel). This conclusion is based on a finding now by this court that Manning did not intentionally or wilfully attempt to violate any ethical provision or engage in any conduct which would be fundamentally prejudicial to the integrity of the profession.

"[A] violation of professional ethics does not ... automatically result in disqualification of counsel." "[E]thical problems cannot be resolved in a vacuum." In disqualification cases, judges cannot "exclude from their minds realities of which fair decision would call for judicial notice."

*United Nuclear Corp. v. General Atomic Co.*, 96 N.M. 155, 629 P.2d 231 at 320, 1980–81 Trade Cas. (CCH) ¶ 63,639, at 77,-454 (N.M.1980). In determining whether the remedy of disqualification is warranted, this court shall balance the costs and benefits that would result from Manning's limited disqualification from asserting a cross-claim as well as examine the conduct of the movants and their attorneys in filing this motion. *See generally Developments in the Law—Conflicts of Interest in the Legal Profession*, 94 Harv.L.Rev. 1244, 1470–82 (1981) (hereinafter cited as *Developments—Conflicts of Interest*).

A. Costs of Disqualification.

1. *Time and Labor Involved by Manning Firm:*

Manning and his law firm have this case on a contingency basis. TR at 372, lines 17–18. In terms of man-hours, the law firm has expended approximately $82,000. *Id.* at 372, lines 7–8. The firm, however, has been compensated one-third of a $35,-000 settlement as to Coopers & Lybrand. *Id.* at 372, lines 20–23. Expenses have been reimbursed by the co-owners through an expense fund. *Id.* at 372, lines 24–25. Furthermore, it appears that labor has been expended by the firm which is implicit in this record:

We [Manning and his law firm] have talked to a number of people. We have talked to the GBI. We have talked to the, there was a federal task, excuse me, not a federal task force, it was federally funded. But there was a task force by

several states back in '79, '80, thereabouts, and we furnished a lot of information to them, got some comments back. We've investigated the status of the leases in Kentucky, on the coal mine, to verify the fact that they probably didn't exist. We have met and talked to virtually all of the co-owners to get their impressions, what information they've had.

*Id.* at 373, lines 16–25 through 374, lines 1–2.

Therefore, the court concludes that given the time and labor involved by the firm, Manning will be prejudiced even if he is disqualified in a limited fashion.

### 2. *Extent of Harm to Clients, The Co-Owners:*

Although this action was filed in October of 1979, the court notes that from a merits point of view, this case is still in its preliminary stages. It was only until after this court's ruling on September 20, 1982, that issues relating to proper party designation and subject matter jurisdiction were resolved. *Delta Coal Program,* 554 F.Supp. 684 (N.D.Ga.1982). In addition, the court notes that the Eleventh Circuit is presently considering these issues pursuant to this court's granting of an interlocutory order under 28 U.S.C. § 1292(b).

Notwithstanding the posture of this case in relation to its ultimate resolution, the court finds that given the legal nuances that have developed in this action, as well as the potential that evidence may be lost through lost memories or lost or destroyed documents, a disqualification of Manning from prosecuting a cross-claim will result in the co-owners suffering delay and inconvenience in their quest to go after the "true defendants." A simple review of the docket sheet of this action as well as an observation of the litigation strategy of the defendants and defendants to the cross-claim underscore this conclusion.

### B. Benefits.

### 1. *Institutional Values:*

Given this court's findings that Manning created a potential for inadequate representation and that Manning created the appearance of impropriety by filing a cross-claim against individuals who perceived that Manning would not sue them, the court concludes that disqualification would serve particular institutional concerns. First, it would serve to underscore this court's displeasure with any devaluation of the intrinsic values of the attorney-client relationship. Second, disqualification could possibly serve as a deterrent against attorneys putting themselves in positions to disrupt the expectations of those entities or individuals whom the attorneys are to serve.

### 2. *Integrity of the Judicial Process:*

This court believes that a trial ought to exemplify procedural justice. In other words, this court deems as most important the concept that "[t]he legitimacy of the result in large part inheres in the process by which that result is achieved." *Developments—Conflicts of Interest,* 94 Harv. L.Rev. at 1475. As to this interest, the court believes that the following factors come into play: (i) A demonstrated threat of a tainted trial; and (ii) the extent to which a breach of confidences or a utilization of documents improperly obtained would give the lawyer an unfair advantage to his present client.

Initially, it is noted that no threat of divided loyalties could surface at this point. Such a threat could have only occurred between May 15 and October 29, 1980, when Manning was attempting not to sue Crum and Leonard. Thus, the court concludes that the notion of procedural justice as to these parties would not be undermined if Manning were not disqualified insofar as principles of conflict of interest are concerned.

The principles of confidentiality and appearance of impropriety, however, raise a different issue. Despite Crum and Leonard's being estopped from raising a Canon 4 issue, when Manning prosecutes a cross-claim against persons who had subjective expectations that he would not sue them, procedural justice could be undermined if there is a demonstration that any docu-

ments turned over to Manning give him an unfair advantage. In other words, to the extent that Crum and Leonard could show either a threat of a tainted trial or an unfair advantage in proceeding through discovery, this court's willingness to disqualify Manning in a limited fashion would be significantly increased.

No such showing, however, has been made by Crum and Leonard. They fail to articulate whatsoever any nexus between the "black notebook" which contains the material Manning received from Deal on April 2 or any other documents received by Manning and the substantive underpinnings of the cross-claim. Furthermore, Crum and Leonard fail to show why these documents would not be subject to discovery pursuant to Fed.R.Civ.P. 26(b)(1). Finally, when Crum and Leonard testified at the hearing on this motion, neither testified as to any specific communications that they had with Manning which could give Manning any strategic upper hand in the prosecuting of the cross-claim. In sum, the court concludes that the notion of procedural justice or the integrity of the judicial process would not be undermined by Manning remaining in this case. While, as a general rule, disqualification benefits procedural justice or the integrity of the judicial process, the facts of this case do not warrant such a conclusion.

C. Laches.

Because a disqualification motion is of an equitable nature, it is appropriate to consider the prior conduct and statements of the movant and its attorneys on the question of the movant's good faith and credibility in connection with the motion to disqualify.

A motion to disqualify opposing counsel should be filed at the onset of the litigation, or "with promptness and reasonable diligence once the facts" upon which the motion is based have become known. A failure to act promptly may warrant denial of the motion.

*United Nuclear Corp.*, 96 N.M. 155, 629 P.2d 231 at 320, 1980–81 Trade Cases (CCH) ¶ 63,639 at 77,454. *Accord, Central*

*Milk Producers Cooperative v. Sentry Food Stores, Inc.*, 573 F.2d 988 (8th Cir. 1978); *Redd v. Shell Oil Co.*, 518 F.2d 311, 314–15 (10th Cir.1975).

In this case, Crum and Leonard were well aware prior to Manning's involvement that as broker-dealers they had potential liability. This is clearly demonstrated in their January 30, 1980 affidavits, where they testify to the fact that they read the plaintiffs' response to the defendants' motion to dismiss. While Manning filed his notice of appearance of counsel for the plaintiffs on May 29, 1980, an actual claim against Crum and Leonard was not filed until October 29, 1980. Therefore, it is at that point when Crum and Leonard were put on notice as to the realization of their potential liability. The motion to disqualify was not filed until November 20, 1981. Therefore, Crum and Leonard's delay in filing a motion raises a reasonable inference that they believed that they would not be harmed by the continuation of Manning's representation of the Program. In other words, their delay can be reasonably perceived as an admission that the principles of confidentiality and conflict of interest are not significantly related to the procedural integrity of their case.

Not only is there a demonstration of delay in the movant's filing of a disqualification motion, but there is a showing of bad faith by Mr. Burnat's filing of it. The following colloquy occurred between Mr. Manning and Mr. Burnat at the hearing for the instant motion; the court hereby credits Mr. Manning's testimony:

By Mr. Burnat:

Q. Mr. Manning, isn't it true that I told you in almost all the conversations I've had with you, that my clients were very much concerned about the co-owners recovering sums from the defendants in this case?

A. That's correct.

Q. And that they wanted this matter to go forward as expeditiously as possible?

A. That's incorrect.

You told me in no uncertain terms several times that if I didn't let your

people out you were going to do everything you could to delay this case, including attempting to get me disqualified.

Q. Isn't it true, Mr. Manning, what I told you was, I thought you should be disqualified and that that would greatly delay this case and I never said it was my purpose and quite to the contrary I told you that my clients did not want to delay the case by having you disqualified, they wanted to go forward and reach recovery against the other defendants?

A. I don't believe you told me that.

. . . .

A. [Y]ou told me in no uncertain terms several times that if I didn't dismiss the claims against your clients, you would do everything you could, to delay this case, including filing the motion and any other thing you could do, appeals, you told me one time in my office, and David Rabin was there, and you haven't seen yet all I can do.

. . . .

A. [I]'m sure it was you and I, discussed at one time I believe this possibility of an agreement where we could collect against them last, and you wouldn't file this motion.

Q. That was discussed wasn't it?

A. That was discussed, I do remember it, that was discussed. And I'm sure it was at least once.

. . . .

Q. Wasn't there also discussed and proposed by you to avoid this motion, that a settlement be made?

A. We have discussed settlement, you and I.

. . . .

Q. Also isn't it true that when I went into your office, that first time that we discussed this matter, that I told you that on a personal basis, I very much would regret having to file this motion?

A. You told me that several times.

Q. I told it to you the first time I brought this up to you, and that was the main purpose I was telling you that?

A. No, you have told me that, not initially because you remember how upset I got about this motion. And how I told you I took it as a personal professional affront. And you and I had some difficulty communicating about the case because of my strong feelings about the motion and which I still have. Testifying has helped me. I've said a few things I wanted to say.

But it was, you have told me several times you didn't bring it for personal reasons against me.

Q. And I also told you that I, on several occasions, that I thought, and before the motion was filed now, that I thought that the motion had validity?

A. You attempted to justify the motion, yes. As any good lawyer should, and under the circumstances is required to.

You never told me that it was a frivolous motion, I'll say that. You never admitted to me that—

. . . .

The whole threat, the motion to disqualify and tell me how long even if you lose that it's going to take you to appeal, and a motion to disqualify for something that I take really gut seriously, that's not an admission that it's frivolous.

But to me, it's a statement that I'm going to, I'm going to delay your case and do everything I can, as long as I can, until you let my people out of this case, and I told you any number of times I wasn't going to do it.

TR at 366, lines 9–25; at 367, lines 1–3, 12–17; at 368, lines 19–25; at 369, lines 5–7, 13–25; at 370, lines 1–11, 20–25; at 371, lines 1–3.

D. Conclusion.

 Upon weighing the numerous factors involved, the court hereby concludes that the costs of disqualifying Manning from prosecuting the cross-claim far outweigh any institutional benefits that could result. While this court is sensitive to the intrinsic values of the attorney-client relationship and possible deterrent effects that could result from a lawyer being disquali-

fied, the facts in this case reveal that disqualification would ultimately harm the co-owners, whose interests Crum and Leonard purportedly quest to serve. In addition, the integrity of the judicial process would not be served by the disqualification of Manning.

The court, however, finds that given the conduct of both Mr. Burnat and Crum and Leonard at both the relevant time at which these events occurred and the hearing of the instant motion, the motion for disqualification was brought solely for tactical reasons, and not for any sensitivity to ethical concerns. This court firmly believes that such conduct cannot be condoned and in fact warrants sanctions of its own. Pursuant to DR1–103(A), one has a duty to move to disqualify whenever there is a non-trivial possibility of a conflict of interest. Rule 11 of the Federal Rules of Civil Procedure provides that the signature of an attorney "constitutes a certificate by him that he has read the pleading; that to his best knowledge, information, and belief there is good ground to support it; and that *it is not interposed for delay.*" (Emphasis added). Furthermore, Model Rule 3.2 provides as follows:

A lawyer shall make reasonable efforts to expedite litigation consistent with the interests of the client.

Similarly, DR7–102(A)(1) provides that, "A lawyer shall not ... file a suit, assert a position, conduct a defense [or] delay a trial ... when he knows or when it is obvious that such action would serve merely to harass or maliciously injure another." In the Comment to the Model Rule, the Bar states the following:

Delay should not be indulged merely for the convenience of the advocates, or for the purpose of frustrating an opposing party's attempt to obtain rightful redress or repose.... *Realizing financial or other benefit from otherwise improper delay in litigation is not a legitimate interest of the client.* (Emphasis added).

Accordingly, the court concludes that Crum, Leonard, and their counsel shall pay attorney's fees and expenses to Manning for his defending against the motion to disqualify. Fed.R.Civ.P. 11; 28 U.S.C. § 1927; Local Court Rule 71.54; *see Roadway Express, Inc. v. Piper,* 447 U.S. 752, 765, 100 S.Ct. 2455, 2463, 65 L.Ed.2d 488 (1980); *North American Foreign Trading Corp.,* 83 F.R.D. 293 (S.D.N.Y.1979); *see generally* Comment, *The Ethics of Moving to Disqualify Opposing Counsel for Conflict of Interest,* 79 Duke L.J. 1310 (1979).

CONCLUSION.

The Motion to Disqualify Joseph R. Manning and Morris & Manning as counsel for Delta Coal Program or any other party to this action is hereby DENIED. The motion of Delta Coal Program for assessment of attorney's fees and expenses is hereby GRANTED. Joseph R. Manning and the law firm of Morris & Manning are hereby DIRECTED to submit evidence relating to the amount of time and labor expended in defending the motion to disqualify. This evidence and supporting papers shall be filed within thirty (30) days of the receipt of this order. The Clerk of this Court, upon receipt of these papers, is hereby DIRECTED to resubmit this case for a determination of attorney's fees and expenses to be assessed against the movants.

Finally, the Clerk is hereby DIRECTED to resubmit the motions designated in footnote one of this court's order of March 31, 1983, in ten (10) days from the receipt of this court's ruling on the assessment of attorney's fees.