PER CURIAM.
Transmark USA, Inc. and Mark Sanford, owner of 100% of the common stock of Transmark (Transmark), seek writs of common law certiorari to review two interlocutory orders. The first order denied Trans-mark’s motion to disqualify counsel representing the Florida Department of Insurance; the Department became the court-appointed receiver (Receiver) of Guarantee Security Life Insurance Company (GSL), a Transmark wholly-owned subsidiary, on August 12,1991. The second order granted the Receiver’s motion to compel discovery of documents and communications Transmark claimed were protected by the attorney-client and accountant-client privileges, and denied Transmark’s motion to compel the return of certain documents from the Receiver based on the same grounds. We deny both petitions.
Transmark was a holding company with both insurance and non-insurance subsidiaries and sub-subsidiaries. This action arises out of the statutory insolvency of GSL. The Receiver in December 1991 sued Transmark, former officers and directors of both Trans-mark and GSL, and outside professionals providing services to GSL. The Receiver, by amended complaint filed on December 20, 1991, alleged that defendants engaged in a continuing scheme between 1984 to 1991 to loot[1] GSL and conceal the true financial condition of GSL from regulators, thereby prolonging GSL’s existence and deepening its insolvency. The Receiver seeks $300 million in damages. The transactions at issue in the complaint include: (a) “corporate year-end restructurings” transactions at years-end 1988, 1989, and 1990, whereby GSL allegedly carried investments with GSL affiliates on its own books as if they were arm’s-length transactions with unrelated third parties; *1114 and (b) “phantom year-end transactions” with Merrill Lynch for years-end 1984, 1985, 1986 and 1988, whereby Merrill Lynch allegedly “purchased” GSL’s junk bonds in exchange for “treasuries” at the end of the year and immediately “sold” them back to Trans-mark after the first of the year. The Receiver alleges the purpose behind the above transactions was to avoid statutory accounting problems which GSL would face as a regulated insurer domiciled in Florida.
The facts out of which this case arises are rather unique. While Transmark had many subsidiaries and sub-subsidiaries, GSL was the source of all the funds within the Trans-mark group of companies. Guarantee Group, Incorporated (GGI), another wholly-owned subsidiary of Transmark, provided all the management and administrative services to GSL and the other companies in the Trans-mark group.[2] GSL itself had no employees but GGI provided it with all the personnel necessary to manage and conduct all aspects of its operations, including legal aspects, pursuant to a written management contract with GGI. The personnel thus were technically GGI “employees,” paid with GSL funds. The officers and directors of Transmark and GSL were moreover for the most part, interlocking.
Transmark formed its own legal department in February 1988, by hiring attorney Dillingham as its general counsel, and hiring attorneys Poppell and Cullen in 1988 and 1989 respectively.[3] The legal staff was transferred to GGI’s payroll by July 1989, and paid through GSL funds. The legal staff and all of Transmark’s legal files were moved in November 1990, from the Transmark building to the building where the GSL offices were located. A legal assistant testified that Transmark maintained its legal files together with that of its subsidiaries: “[t]hey were all together, they were in numerical sequence, but they were all in the same filing cabinet.” Transmark contributed all of GGI’s stock to GSL on December 31, 1990, and GGI became a wholly-owned subsidiary of GSL.[4]
The evidence supports the trial court’s finding that Dillingham, Poppell and Cullen legally advised the Transmark group of companies on the corporate restructurings of Transmark affiliates throughout their employment. Transmark also periodically retained outside counsel and accountants. Transmark retained a lawyer of the Smith Hulsey & Busey firm in 1987-1988 regarding a tax matter (the possibility of GGI writing off additions to computer software).[5] Trans-mark, in 1988, briefly retained another member of the same law firm for help in preparing and filing its Form lOK/Annual Report with the SEC. The law firm of Katz, Kutter, Haigler, Alderman, Davis, Marks & Rutledge (Katz Kutter) was also retained to provide advice on Florida statutory insurance matters pertaining to the 1990 restructuring. A lawyer with Katz Kutter testified that the firm provided legal services to both GSL and Transmark in that capacity. Poppell also testified there was no expectation or mandate that communications with Katz Kutter be withheld from either Transmark or GSL. The law firm of Shereff, Friedman, Hoffman & Goodman (Shereff Friedman) was also retained to provide legal advice in connection with the 1988 restructuring and certain acquisitions. Mr. Levinson, a representative of Shereff Friedman, testified that the firm represented both Transmark and GSL in these transactions. Finally, Coopers & Lybrand (Coopers), an accounting firm, was retained annually to perform audits of Transmark and GSL. Coopers was retained pursuant to a single engagement letter each year.
GSL was placed under administrative supervision on May 16, 1991. Michael Heekin, *1115 the Deputy Receiver, had access t.o GSL premises and files during this time. Mark and Rob Sanford, directors of both GSL and Transmark, on August 12,1991, consented to the placement of GSL into receivership. When the Receiver assumed control, it dismissed most of GSL’s senior management, but retained “in-house” attorneys Poppell and Cullen, as well as some legal support staff. It then hired two outside law firms, Tew & Garcia-Pedrosa and Smith Hulsey & Busey, to represent it in litigation against Transmark.
The Receiver requested production of documents from: Transmark; Mark Sanford; Coopers & Lybrand; Shereff Friedman; and Katz, Kutter. These parties withheld production of the documents based on the attorney-client and accountant-client privileges asserted by Transmark and Sanford. Despite the fact Coopers had already produced the financial documents in question to the SEC in response to a subpoena and to plaintiffs in a pending federal securities action against Transmark,[6] Coopers withheld production based on the accountant-client privilege. The Receiver moved to compel production.
Transmark in turn moved to disqualify Poppell, his support staff, and the Receiver’s outside counsel on October 27, 1992,[7] more than ten months after suit was filed and about one week before the Receiver was scheduled to begin a month of nationwide depositions of Coopers & Lybrand. Trans-mark insists, however, that its motion to disqualify was timely because it did not discover its former in-house attorneys were representing the Receiver in the suit until September 2, 1992, when Poppell was deposed.
A four-day evidentiary hearing was held, in February 1993, on the motion to disqualify and the motion to compel production of documents. Poppell testified there was no expectation he would withhold information from GSL or Transmark: “[i]t was a common representation with common ... individuals involved.” Poppell insisted he had represented the “entire group of corporations.” He testified in his deposition: “the matters that we’re .discussing that are at issue are matters in which I represented Transmark and GSL virtually simultaneously. I represented an entire group of corporations. I can’t help the fact that the control of Trans-mark was severed by the Department of Insurance.”
Cullen also testified he was representing Transmark and GSL simultaneously. Cullen further testified he did not believe there was any privileged information he had with Transmark that he could not share with GSL. “The obligations ran back and forth in such a web that there was no way for information ever to have been privileged or confidences between any of the companies.” Thomas Gibbs, president of GSL, also testified pthat within the Transmark group of corporations, there were no restrictions on access to information concerning the affairs of GSL or the affairs of Transmark.
Among the many findings and reasons for denying the motions to disqualify, the trial court found that, as of the date the complaint was filed (December 1991), Transmark was aware that some of its former employees remained employed by the Receiver.[8] The trial court issued an order denying disqualification and an order granting the motions to compel.
Florida Rule of Appellate Procedure 9.030(b)(2)(A) provides that the district courts of appeal have jurisdiction to issue writs of certiorari to review non-final orders not appealable under rule 9.130, Florida Rules of Appellate Procedure. Orders granting or denying motions to disqualify a party’s attorney may be reviewed by certio- *1116 rari. Kenn Air v. Gainesville-Alachua County Regional Airport Auth, 593 So.2d 1219, 1221 (Fla. 1st DCA 1992). Orders granting a party’s motion to compel discovery may also be reviewed by certiorari. Martin-Johnson, Inc. v. Savage, 509 So.2d 1097, 1099 (Fla.1987); Baron, Melnick & Powell, P.A. v. Costa, 478 So.2d 492 (Fla. 1st DCA 1985). In seeking certiorari review of a pretrial, nonappealable order, the party seeking review must demonstrate not only that the trial judge “departed from the essential requirements of law” but also that the harm resulting from the erroneous order is material and cannot be remedied on appeal from the final judgment or order. Martin-Johnson, 509 So.2d at 1099.
Addressing first Transmark’s petition for certiorari review of the order denying the requested disqualification of Poppell, Cullen and Receiver’s outside counsel, we agree with the Receiver that Transmark waived any right it had to seek disqualification and therefore deny the petition. A motion to disqualify should be made with reasonable promptness after the party discovers the facts which lead to the motion. Balda v. Sorchych, 616 So.2d 1114, 1116 (Fla. 5th DCA 1993) (delay of three years in raising conflict deemed waiver); Cox v. American Cast Iron Pipe Co., 847 F.2d 725 (11th Cir.1988) (delay of nineteen months deemed waiver); Glover v. Libman, 578 F.Supp. 748 (N.D.Ga.1983) (delay of one year deemed waiver); Jackson v. J.C. Penney Co., Inc., 521 F.Supp. 1032, 1034 (N.D.Ga.1981) (delay of fifteen months deemed waiver). The rationale behind this rule is to prevent a litigant from using the motion as a tool to deprive his opponent of counsel of his choice after completing substantial preparation of the case. Cox v. American Cast Iron Pipe Co., 847 F.2d at 729 (quoting Jackson v. J.C. Penney Co., Inc., 521 F.Supp. at 1034).
Transmark claims that it did not know of the claimed conflict until approximately eight weeks before filing its motion; and while it may have known Poppell and Cullen remained employed by the Receiver in December 1991, it did not know the nature of their work for the Receiver. Transmark knew, however, that attorneys Poppell and Cullen would be engaged in legal matters and was on notice as to what legal matters they had been and were continuing to engage in by the time the Receiver filed its complaint. Even if they did not, the trial court’s undisputed finding that Transmark engaged in substantial discovery (forty depositions) from the day the suit was filed leads to the inescapable conclusion that Transmark knew long before October 1992 that Poppell and Cullen were assisting the Receiver in pretrial matters. Transmark did not raise the question of conflict until more than ten months had elapsed and until after the Receiver had already paid approximately two million dollars in legal fees to its two outside lawyers. Transmark effectively waived its right to seek disqualification in failing to timely file its motion. Having reached this conclusion on the waiver issue, we find it unnecessary to address the remaining issues urged as a basis for denying the petition.
The trial court having failed to depart from the essential requirements of law in denying the motion to disqualify, we decline to grant certiorari on this issue.
We turn next to Transmark’s second petition, which seeks review of the trial court’s order compelling Transmark to produce documents it asserts are privileged. Transmark cannot assert the attorney-client or accountant-client privileges against GSL in this action because the material is not privileged. Florida Sheriffs’ Self-Insurance Fund v. Escambia County, 585 So.2d 461 (Fla. 1st DCA 1991). Sections 90.502(4)(e) and 90.5055(4)(c), Florida Statutes (1991), provide an exception to the attorney-client and accountant-client privileges, respectively, when a communication is relevant to a matter of common interest and made to a lawyer or accountant retained or consulted in common.[9] Contrary to Transmark’s contention, *1117 the exceptions found at sections 90.502(4)(e) and 90.5055(4)(c) apply regardless of whether or not both clients were physically present at the time the communication was made, provided the professional relationship between the clients and attorney or accountant existed at the time of the communication. See Charles W. Ehrhardt, Florida Evidence § 502.7 (1993) (attorney-client privilege exceptions). See also 6B Fla.Stat.Ann. 519 (1979) (Commentary on 1978 amendment to § 90.5055 — accountant-client privilege).
Here, there is competent, substantial evidence to support the trial court’s finding that Shereff Friedman, Katz Kutter and Coopers represented GSL and Transmark jointly in matters pertinent to the transactions at issue in the complaint (corporate restructurings). Each of the firms testified to that effect. Moreover, there is also competent substantial evidence to support the trial court’s finding that Poppell was counsel to both the parent Transmark and the subsidiary GSL in those same transactions. There was no expectation of confidentiality among the various companies in the Transmark family. As the documents meet the statutory exceptions to the attorney-client and accountant-client privileges contained in sections 90.502(4)(e) and 90.5055(4)(e), the trial court did not depart from the essential requirements of law in its order relating to discovery issues.
Accordingly, we deny both petitions for writ of certiorari.
SMITH, MICKLE and LAWRENCE, JJ., concur.

. The Receiver alleged the defendants "looted" GSL through excessive compensation, improper dividends, excessive fees paid for management services, less-than-arm’s-length sale of securities, and investment in millions of dollars of high-yield, high-risk “junk bonds.”

. Capital Management, another subsidiary of Transmark, also provided management investment services to GSL.

. GSL’s president testified by deposition that GSL had its own ''in-house” legal department (i.e., Margaret Gibbs and Ligouri), but when Dill-ingham was hired, these individuals had little responsibility for GSL’s investment portfolio.

. GGI then changed its name to Landmark Insurance Services, Incorporated.

. The Smith Hulsey lawyer was no longer working with the firm when the Receiver retained the firm for representation in this litigation. The files pertaining to his representation of Trans-mark nevertheless remained with Smith Hulsey.

. No confidential accountant-client privilege exists under federal law. Couch v. United States, 409 U.S. 322, 335, 93 S.Ct. 611, 619, 34 L.Ed.2d 548 (1973).

. Cullen was no longer employed by the Receiver at the time Transmark moved to disqualify. The only employees of the original legal staff who remained were Poppell; legal assistant, Frost; and legal secretary, Scrivener. At the time it filed its petition, however, Poppell, too, was no longer employed by the Receiver.

.The trial court's finding that Transmark engaged in extensive discovery from December 1991 to October 1992 also implies Transmark must have known of a conflict before the date it claims (i.e., September 1992).

. Section 90.502(4)(e) states that there is no lawyer-client privilege when:
[a] communication is relevant to a matter of common interest between two or more clients, or their successors in interest, if the communication was made by any of them to a lawyer retained or consulted in common when offered *1117 in a civil action between the clients or their successors in interest.
Section 90.5055(4)(c) provides an almost identical exception to the accountant client-privilege, stating no privilege attaches when:
[a] communication is relevant to a matter of common interest between two or more clients, if the communication was made by any of them to an accountant retained or consulted in common when offered in a civil action between the clients.