THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, et al., Plaintiffs,

v.

ANODYNE, INC., et al., Defendants.

Nos. 03–21873–CIV–SEITZ, 03–21873–CIV–KLEIN.

United States District Court, S.D. Florida, Miami Division.

Jan. 27, 2005.

Robert H. Blank, Mark S. Auerbacher, Katz Barron Squitero Faust, P.A., Miami, FL, Dennis M. Stotts, Robert Grady, Katz Barron Squitero Faust, P.A., Ft. Lauderdale, FL, Counsel for Plaintiffs The Prudential Insurance Company of America and 745 Property Investments.

James P.E. Roen, Levey, Airan, Brownstein, Shevin, Friedman, Roen & Kelso, LLP, Gables One Tower, Penthouse, Coral Gables, FL, Counsel for Plaintiffs Floyd H. Abramson, Julian J. Golding and Sunshine Associates.

John J. Jawor, Bolingbrook, IL, Counsel for Co–Plaintiff Sunshine Associates.

Wirt T. Maxey, Peters, Maxey, Short & Maxey, P.A., Coral Gables, FL, Co–Counsel for Defendants Continental Equities, Inc., and Imeson International Industrial Park, Inc.

Roger D. Schwenke, Carlton Fields, P.A., Tampa, FL, Benjamine Reid, Amy Furness, Carlton Fields, P.A., Miami, FL, Co–Counsel for Defendants Continental Equities, Inc., and Imeson International Industrial Park, Inc.

Stephen J. Darmody, Shook, Hardy & Bacon, LLP, Miami, FL, Counsel for Defendant UNUM Life Insurance Company of America.

### ORDER DENYING MOTION TO WITHDRAW

KLEIN, United States Magistrate Judge.

THIS CAUSE comes before the Court for a hearing on January 20, 2005, upon Carlton Fields, P.A.'s ("Carlton Fields") Motion to Withdraw as Co–Counsel for Defendant Continental Equities, Inc. ("Continental") and Imeson International Industrial Park, Inc. ("Imeson") (D.E. No. 91).[1] Defendants Continental and Imeson

---

1. District Judge Patricia A. Seitz referred this matter to Magistrate Judge Ted E. Bandstra, who thereafter entered an order of recusal in

filed a joint Memorandum in Opposition to the motion to withdraw (D.E. No. 95); Plaintiff The Prudential Insurance Company of America ("Prudential") filed a Response in Opposition to Defendants' opposition (D.E. No. 104); and Continental and Imeson filed a Reply thereto (D.E. No. 106). The Court has considered the motion and responses thereto, the oral arguments of counsel, and is otherwise fully advised in the premises. For the reasons stated on the record at the hearing, which are adopted herein and summarized below, the Court DENIES Carlton Fields' Motion to Withdraw.

### Background [2]

This matter arises out of the environment assessment and remediation of a federally-designated Superfund site located in North Miami Beach, Florida (the "Anodyne site"). The instant lawsuit was brought by Plaintiffs pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9601, *et seq.*, to recover from Defendants costs and contribution of costs incurred and to be incurred in response to releases and threatened releases of hazardous substances at the Anodyne site. *See* Complaint, ¶ 1.

The law firms of Carlton Fields, P.A. ("Carlton Fields") and Peters, Maxey, Short & Maxey, P.A. ("Maxey") are co-counsel to Defendants Continental and Imeson in this suit. Approximately seven months after the complaint was filed, Carl-

ton Fields discovered it also is counsel to Plaintiff Prudential in matters entirely unrelated to the instant action. Accordingly, Carlton Fields has moved to withdraw from representing Continental and Imeson on the ground that its concurrent representation of these two Defendants in this suit, and Prudential in other matters, violates Rule 4–1.7(a) of the Rules Regulating the Florida Bar.[3] Carlton Fields is in an unusual position as its clients and co-counsel in this litigation, Continental and Imeson and the Maxey firm, *oppose* the motion to withdraw. Prudential, on the other hand, *supports* the withdrawal although it did not independently seek to disqualify Carlton Fields from representing its adversaries here.[4]

A brief summary of the facts connected with Carlton Fields' representation of Continental and Prudential is helpful to place the issue at hand in context. In 1987, Continental retained Roger D. Schwenke, a partner in Carlton Fields' Tampa office, with regard to an environmental matter involving a company called Anodyne, Inc. ("Anodyne"). The matter involved groundwater contamination at a piece of property in an industrial park in North Miami Beach, which at one time had been owned by Continental and leased by Continental to Anodyne (the Anodyne site). Continental became aware of the issue through a letter Continental received in November 1986 regarding an investigation of property owned by Prudential Realty

---

the case; the case was then reassigned to the undersigned Magistrate Judge (D.E.112, 113).

2. These facts, drawn from the papers filed in connection with Carlton Fields' motion to withdraw and the representations made by counsel at the hearing on this motion, are undisputed for purposes of the instant motion.

3. The conduct of attorneys practicing in this district is regulated by the current Rules Reg-

ulating the Florida Bar. *See* Rule 11.1.C, Local Rules of the United States District Court for the Southern District of Florida.

4. At the hearing, counsel for Prudential explained that his client did not formally move to disqualify Carlton Fields from representing Continental because Prudential was advised that Carlton Fields would take the initiative and file a motion to withdraw.

Group, which was located adjacent to the Anodyne site. Continental thereafter learned that the Environmental Protection Agency ("EPA") had identified the Anodyne site as a potential problem area. At the time it began representing Continental, Carlton Fields' client and conflicts records system listed Continental as its client, and 745 Property Investment ("745") and Prudential Realty Group as adverse parties.

For many years Mr. Schwenke and Carlton Fields represented Continental with respect to the Anodyne site in administrative proceedings involving the EPA and the Florida Department of Environmental Protection. After Continental settled litigation brought by the EPA relating to the Anodyne site, Carlton Fields' work with Continental related to that property did not involve any further litigation issues until October 2003, when Continental was served with a complaint by Prudential, 745, and the other plaintiffs in the instant cost recovery and contribution lawsuit.[5] This suit is the third one in which Mr. Schwenke and Carlton Fields has assisted the Maxey firm in connection with Continental and the Anodyne site.

Meanwhile, back in 1995, Prudential retained Carlton Fields to represent sales agents (not Prudential) in connection with matters that did not relate to the Anodyne matter. Several years later, Prudential Insurance became a client of Carlton

Fields with respect to several other matters, none of which related to the Anodyne matter. In particular, Carlton Fields represented, and continues to represent Prudential in on-going regulatory matters before the Florida Department of Insurance. The firm's attorneys who handle such matters are located in its Tallahassee office.[6]

Due to an error in its conflicts check procedure, for many years Carlton Fields failed to recognize the conflict of interest inherent in representing both Continental and Prudential, albeit in separate, unrelated matters. The conflict finally came to light in mid to late February 2004, when Prudential's auditors sought information from Carlton Fields regarding litigation matters involving Prudential and its subsidiaries, including 745. A search of the firm's conflicts database disclosed the link between Continental, 745, and Prudential.

When the conflict of interest was identified, Carlton Fields sought the consent of Continental and Prudential to its continued representation, as permitted by Rule of Professional Conduct 4–1.7(a)(1) and (2). Carlton Fields reasoned that the matters were unrelated, and the lawyers dealing with the Continental matter were in no way involved with any Prudential matter, and vice-versa. Carlton Fields also advised Continental and Prudential that if they waived the conflict, an ethical screen would be put in place.[7] Continental con-

---

5. Though Plaintiffs filed their complaint in July 2003, summonses were not issued for Defendants Continental and Imeson until October 22, 2003. (D.E. No. 1, 4, 6.) The Maxey firm, in filing its motion to dismiss on behalf of Continental and Imeson in December 2003, noted on the certificate of service that Mr. Schwenke was co-counsel (D.E. No. 21), but Mr. Schwenke did not seek to appear *pro hac vice* in this case until February 19, 2004 (D.E. No. 43). For convenience's sake, the Court will hereinafter refer to both Continental and Imeson simply as Continental.

6. Mr. Schwenke was unsure "how the current claim become one of Prudential Insurance (with which Carlton Fields has a client relationship in any view of the matter) when the original Prudential entity was Prudential Realty Group which is a subsidiary with which Carlton Fields had no direct client relationship." *See* Motion to Withdraw at 4.

7. Such a screen has no legal efficacy because of the rule of imputed disqualification, Rule 4–1.10. Thus, disqualification of one attorney in the firm in an instance such as this means disqualification of all.

sented to waive the conflict, but Prudential declined to do so in May or June 2004, based on its pre-existing corporate policy of not waiving litigation conflicts except in the most unusual circumstances.

Carlton Fields then filed the instant motion to withdraw in October 2004. Prudential supports withdrawal. Continental argues against the motion on the grounds that *it* was Carlton Fields' client years before Carlton Fields undertook the representation of Prudential; that if any client has a right to assert a *conflict of interest* under Rule 4–1.7(a), it is the earlier rather than the later client (a right which Continental has waived); that allowing Carlton Fields to withdraw in this case would result in severe prejudice to Continental; and that Prudential has waived any right to object to Carlton Fields' representation of Continental.

### Discussion

■ Rule 4–1.7(a) of the Rules Regulating the Florida Bar regulates an attorney's ability to undertake representation adverse to a present client. The rule provides:

> A lawyer shall not represent a client if the representation of that client will be directly adverse to the interests of another client, unless:
>
> (1) the lawyer reasonably believes the representation will not adversely affect the lawyer's responsibilities to and relationship with the other client; and
>
> (2) each client consents after consultation.

There is no question that Carlton Fields' dual representation of Continental and Prudential, adverse parties in this lawsuit, constitutes a conflict of interest under Rule 4–1.7(a).

The conflict is waivable, however, if both subsections (1) and (2), cited above, are met.[8] Mr. Schwenke implicitly concluded that Carlton Fields could satisfy subsection (1) by proceeding to seek consent under subsection (2); stated another way, Carlton Fields concluded that its dual representation of these parties would not adversely affect the firm's responsibilities to and relationship with either client, because Mr. Schwenke then went to the second step of attempting to obtain consent from both. Continental agreed to waive the conflict of interest, but Prudential exercised its absolute right to *not* waive the conflict. Because the conditions for waiver of the conflict of interest have not been met, Carlton Fields' continued representation of both Continental and Prudential violates Rule 4–1.7(a).

The question then becomes, what is the appropriate remedy for this ethical violation? Carlton Fields states that under the circumstances, it "has no choice but to request leave to withdraw" from representing Continental. *See* Motion to Withdraw at 5.

■ However, Carlton Fields' disqualification is not mandatory even though the Court finds the law firm is violating a conflict of interest rule. *See SWS Financial Fund A v. Salomon Bros., Inc.*, 790 F.Supp. 1392, 1399 (N.D.Ill.1992) (disqualification does not automatically follow from a finding that a law firm violated a conflict of interest rule). "Although disqualification is ordinarily the result of a finding that a disciplinary rule prohibits an attorney's appearance in a case, disqualification is never automatic." *Id.* at 1400 (citation omitted, and citing cases which stand for this proposition). *See also, e.g., Research Corp. Techs., Inc. v. Hewlett–Packard Co.*, 936 F.Supp. 697, 701 (D.Ariz.1996) ("The purposes behind the ethical rules favor an

---

**8.** The fact that it is waivable militates against the strength and depth of the conflict, differ-entiating it from those conflicts which are not waivable under any circumstances.

approach which does not automatically require disqualification."); *Gould v. Mitsui Mining & Smelting Co.*, 738 F.Supp. 1121, 1124 (N.D.Ohio 1990) (court has broad discretion in determining whether counsel should be disqualified in ongoing litigation, and ethical rules should not be applied blindly without consideration of relative handicaps); Geoffrey C. Hazard, Jr. & W. William Hodes, *The Law of Lawyering: A Handbook on The Model Rules of Professional Conduct* § 1.7:207 (2d ed. 1994 Supp.) (noting that some recent cases have taken a less stringent stance towards concurrent representation conflicts, at least in the disqualification context, and citing *Salomon Bros.* as a good example of this).

As the court in *Salomon Bros.* discussed, disqualification is but one of three sanctions available to enforce the prophylactic conflicts rules. 790 F.Supp. at 1400. Other sanctions include disciplinary proceedings and civil remedies, e.g., malpractice suits. *Id.* Disqualification, as opposed to the other two sanctions which impose costs only on the attorney who has violated the rules, "is a blunt device [that] foists substantial costs upon innocent third parties." *Id.* These costs include the delay, inconvenience, and expense an innocent client may incur, as well as the deprivation of the innocent client's counsel of choice. *Id.* Additionally, it may be difficult for a replacement attorney to fully master factual and legal nuances in a complex case, actually impairing the adversarial process. *Id.* Moreover, the disqualification process itself slows the litigation and, as the *Salomon Bros.* court pointed out, is frequently used as a "dilatory tactic[ ] intended to 'divert [ ] the litigation from attention to the merits.'" *Id.* at 1400–01 (citation omitted).

Thus, "[g]iven the costs imposed by disqualification and the theoretical availability of alternative means of enforcement of the disciplinary code, a court should look to the purposes of the rule violated in order to determine if disqualification is a desirable sanction." *Id.* at 1401. The two basic purposes behind Rule 4–1.7(a) are to protect confidences that a client may have shared with his attorney, and to safeguard loyalty as a feature of the attorney-client relationship. *Id.* Based on the information provided to this Court in connection with the instant motion to withdraw, neither of these goals would be compromised by refusing to allow Carlton Fields to withdraw from representation of Continental in this suit. Neither side disputes that Carlton Fields' representations involve entirely unrelated matters, and that attorneys within the Carlton Fields law firm have not shared any information regarding their respective clients with each other. Moreover, neither side has suggested that there will be any diminution in the vigor with which Carlton Fields represents it.

Rather than reflexively requiring disqualification for an ethical infraction, the better approach is to employ a balancing test. Courts have considered various factors, such as the nature of the ethical violation; the prejudice to the parties; the effectiveness of counsel in light of the violations; the public's perception of the profession; and whether or not the attempt to disqualify an attorney is used as a tactical device or a means of harassment. *Research Corp.*, 936 F.Supp. at 703 (court should consider facts and circumstances of each case); *Gould*, 738 F.Supp. at 1124, 1126 (noting that "disqualification questions are intensely fact-specific" and applying a balancing test); *Bodily v. Intermountain Health Care Corp.*, 649 F.Supp. 468, 478 (D.Utah 1986) (employing balancing test).

On balance, the Court finds the relevant factors clearly weigh *against* disqualification and *in favor of keeping* Carlton Fields in this case as Continental's counsel.

█ Weighing heavily against allowing Carlton Fields to withdraw is the fact that Continental was Carlton Fields' client long before the firm agreed to represent Prudential. Carlton Fields owes a duty of loyalty to its older client. "A lawyer's duty to his client is that of a fiduciary or trustee." *Cinema 5 Ltd. v. Cinerama, Inc.*, 528 F.2d 1384, 1386 (2d Cir.1976); *see also* Rule 4–1.7 cmt. (2004) ("Loyalty is an essential element in the lawyer's relationship to a client."). The propriety of a firm concurrently representing two clients whose interests are opposed to one another "must be measured not so much against the similarities in litigation, as against the duty of undivided loyalty which an attorney owes to each of his clients." *Cinema 5*, 528 F.2d at 1386; *see also Harte Biltmore Ltd. v. First Pa. Bank, P.A.*, 655 F.Supp. 419, 421 (S.D.Fla.1987) (quoting *Cinema 5* ).

Mr. Schwenke has represented Continental in connection with the Anodyne site since 1987. Continental is entitled to feel, at least until the litigation surrounding the remediation of the site is resolved, it had Mr. Schwenke's "undivided loyalty as its advocate and champion, and could rely upon his 'undivided allegiance and faithful, devoted service.'" *Cinema 5*, 528 F.2d at 1386 (citation omitted). Carlton Fields' attempt to drop Continental as a client in favor of Prudential would result in a breach of the duty of loyalty the firm owes to Continental. Carlton Fields "may not evade ethical responsibilities by choosing to jettison a client whose continuing representation becomes awkward. Allowing lawyers to pick the more attractive representation would denigrate the fundamental concept of client loyalty." *Harrison v. Fisons Corp.*, 819 F.Supp. 1039, 1041 (M.D.Fla.1993); *see also Harte*, 655 F.Supp. at 421 (law firm breached duty of undivided loyalty owed to first client when it withdrew from representing first client in favor of representing another client against him); *In re Jet 1 Center, Inc.*, 310 B.R. 649, 653 (Bkrtcy.M.D.Fla.2004) (citing *Harrison* with approval).

█ This Court's ruling is that the motion is denied based on Carlton Fields' duty of loyalty to its first client. In addition, this Court has the authority under Rule 4–1.16(c) to require that Carlton Fields continue to represent Continental. The rule provides that a lawyer shall, when ordered to do so by a tribunal, continue representation notwithstanding good cause for terminating the representation.[9] The Comment to Rule 4–1.16(a) seems to indicate that the rule applies only to those situations in which an attorney must withdraw because a client has asked him to engage in conduct that is illegal or violates the Rules of Professional Conduct. However, the Comment to Rule 4–1.7, which deals with conflicts of interest, states: "If such a conflict arises after representation has been undertaken, the lawyer should withdraw from representation. See rule 4–1.16." Thus, the Court appears to be authorized to employ Rule 4–1.16(c) in instances deriving from conflicts under 4–1.7. Considerations other than the mere existence of a conflict of the kind which exists here should be weighed in determining whether to apply Rule 4–1.16(c).

The Court finds that Continental will suffer great prejudice if Mr. Schwenke and his firm are allowed to withdraw from representing Continental in this suit. For the past seventeen or eighteen years, Continental has relied on Mr. Schwenke's considerable expertise as an environmental

---

9. Rule 4–1.16(a)(1) provides in relevant part that, "[e]xcept as stated in subdivision (c), a lawyer shall not represent a client or, where representation has commenced, shall withdraw from the representation of a client if: (1) the representation will result in violation of the Rules of Professional Conduct or law."

attorney familiar with environmental cleanup and CERCLA in general, and with the Anodyne Superfund site in particular. The Maxey firm is small; it consists of three partners, two of whom are elderly, and one part-time associate. If Mr. Schwenke were allowed to withdraw, the Maxey firm would be unable to defend Continental on its own in this complex case. Continental would be forced to find an experienced CERCLA attorney who would have to spend a significant amount of time getting up to speed on this case. Mr. Schwenke estimated in 1995 that it would cost nearly $95,000.00 for new counsel to become familiar with the issues surrounding the Anodyne site, and the cost can only have increased since then. Continental has undoubtedly already paid fees to Carlton Fields in connection with this matter. Recoupment of those fees is questionable. Moreover, Continental would need to hire a law firm with sufficient expertise and resources to devote to a complex case such as this. That could prove difficult: at the hearing, Mr. Maxey stated that he had already made a few inquiries regarding substitute counsel; the firms he contacted declined to represent Continental because they, like Carlton Fields, already represented Prudential and thus had the same conflict. Continental, an innocent client, should not be penalized for its counsel's error in taking on Prudential as a client after the potential adversity to an existing client (as defined by Rule 4–1.7(a)) was known or should have been known by Carlton Fields. Continental should not suffer such prejudice by allowing Carlton Fields to drop it as a client in favor of Prudential, which became Carlton Fields' client much later.

On the other hand, looking at the matter from Prudential's perspective, there has been no showing that Prudential will be prejudiced by Carlton Fields' continued representation of Continental in the instant litigation, notwithstanding the existence of a conflict of interest under Rule 4–1.7(a). *No one* has expressed any concern that Mr. Schwenke's and Carlton Fields' continued representation would adversely impact Prudential, or that its confidences will be compromised. Carlton Fields implicitly concluded there would be no adverse impact on either Prudential or Continental, for Mr. Schwenke sought the clients' consent and waiver of the conflict as contemplated by Rule 4–1.7(a)(2). If he had believed that either party would be adversely impacted by dual representation, he could not have satisfied the requirement of 4–1.7(a)(1) and he could not have proceeded to seek consent under subsection (2).

Furthermore, Prudential has not shown that it would be adversely affected by the continued representation of Continental by Carlton Fields. At the hearing, when questioned by the Court on this specific issue, counsel for Prudential was unable to identify any possible prejudice or compromise of confidentiality that Prudential might suffer if Mr. Schwenke and Carlton Fields continued to represent Continental in this case. It thus explicitly and implicitly agrees with Carlton Fields' original assessment that the firm satisfied 4–1.7(a)(1), i.e., that its interests will not be adversely affected by Carlton Fields' continued representation of Continental in this matter.

Other than the stated existence of a conflict under Rule 4–1.7(a), Prudential's counsel acknowledged that the only concern Prudential had would be its "inherent discomfort" in having Carlton Fields, its counsel in an admittedly unrelated matter, represent an adverse party in this lawsuit. However, the attorneys representing Continental and Prudential work in different locations (Tampa and Tallahassee, respectively) and have not discussed their respective cases with one another. The instant litigation involves recovery under CERCLA of money Prudential and others alleg-

edly spent in connection with cleaning up the Anodyne site. Carlton Fields' representation of Prudential involves entirely unrelated regulatory matters before a state agency. Prudential's counsel specifically stated that he was not aware of any knowledge that Mr. Schwenke or Carlton Fields possessed that would impair Prudential's position in this case. There simply has not been any showing of prejudice to Prudential if Carlton Fields were to continue to represent Continental in this case.[10] *See Tipton v. Canadian Imperial Bank of Commerce,* 872 F.2d 1491, 1499 (11th Cir.1989) (plaintiff's motion to disqualify defense counsel properly denied where attorney who withdrew averred she had never discussed her representation of plaintiff in unrelated property dispute with lawyers in her firm representing defense counsel except in immaterial ways, and where defense counsel attested they had obtained no confidential information with respect to plaintiff from the lawyer representing plaintiff in the property dispute). All of these factors militate in favor of the Court's decision to invoke Rule 4–1.16(c), requiring Carlton Fields to continue representation of Continental notwithstanding

its conflict under Rules 4–1.7(a) and 4–1.16(a)(1).

The Court adds that it is *not* requiring that Carlton Fields drop Prudential as a client. As in *Salomon Bros.,* such a requirement is unnecessary. It is up to Carlton Fields to decide whether it will do so, or risk disciplinary action or a malpractice suit. These risks could be eliminated by Carlton Fields simply asking Prudential, in light of this Court's ruling, if it wishes to remain as a client. Or, Carlton Fields may decide not to press the issue, and continue on its present course with Prudential. If Prudential decides to stay on as Carlton Fields' client, that is Prudential's choice, with all the implicit ramifications which such a choice entails.

### Conclusion

Because the prejudice to Continental will be severe if Carlton Fields is allowed to withdraw, and there will no prejudice to or adverse effect on Prudential if Carlton Fields is required to remain in the case, the Court denies the motion to withdraw. Mr. Schwenke and Carlton Fields shall remain in this case as co-counsel for Continental.[11] If Carlton Fields wishes to drop

---

**10.** Although these facts certainly have no bearing on and do not save Carlton Fields either from the existence of a conflict under Rule 4–1.7 or from imputed disqualification, they are useful to the Court in its determination as to whether to apply Rule 4–1.16(c).

**11.** In view of this ruling, the Court need not reach Continental's alternative argument for denying the motion to withdraw, namely, that Prudential waived any right to object to Carlton Fields representing Continental because Prudential has known for some time that the firm represented both parties, yet failed to make a timely objection. *See e.g., Transmark, USA, Inc. v. State Dept. of Insur.,* 631 So.2d 1112, 1116 (Fla. 1st DCA 1994) (motion to disqualify should be made with reasonable promptness after the party discovers the facts which lead to the motion); *Lee v. Gadasa Corp.,* 714 So.2d 610, 612 (Fla. 1st DCA 1998) (respondent waived right to seek disqualifica-

tion where respondent had constructive knowledge of the claimed conflict of interest for ten years, and actual knowledge for several years, before the motion to disqualify was filed). Continental cites letters from September—December 1994, *see* Mem. in Opp'n, Comp. Ex. A, which show that Prudential's then in-house counsel Stephen A. Lauer and outside counsel Dennis M. Stotts (who still represents Prudential) knew that Carlton Fields was representing Continental in connection with the Anodyne site, which in turn suggests that Prudential knew or should have known of a possible conflict of interest when it first sought to retain the law firm in 1995. Prudential counters that it is a large corporation and was not aware of the conflict, and that it reasonably relied on Carlton Fields to advise it of conflicts. Yet how is knowledge imputed to a large corporation if not through its own counsel? *In other words, who else in* the corporate structure besides corporate

Prudential as a client, or if Prudential wishes to drop Carlton Fields as its attorneys, that is a matter for them to decide between themselves and is beyond the purview of this Order. Accordingly, it is hereby

**ORDERED AND ADJUDGED** that Carlton Fields' Motion to Withdraw as Counsel (D.E. No. 91) is **DENIED.**

counsel would be charged with knowing which firms represent Prudential and which represent known adversaries? However, the Court need not, and does not, decide whether knowledge of counsel can be imputed to Prudential as a corporation, and whether such imputed knowledge imposes a duty on the corporation to act promptly and diligently to uncover possible conflicts. Waiver is still an open question which will be only be addressed if and when it becomes necessary to do so.